(133 App. Div. 635.)

## In re NEW YORK INDEPENDENT TELEPHONE CO.

(Supreme Court, Appellate Division, First Department. July 13, 1909.)

1. TELEGRAPHS AND TELEPHONES (§ 10\*) — FRANCHISE — AUTHORITY TO USE STREETS—SUFFICIENCY OF GRANT.

Greater New York Charter (Laws 1901, p. 36, c. 466) § 71, provides that the city's rights in its streets and other public places are inalienable. Section 72 provides that every grant of or relating to a franchise of any character to a person or corporation must, unless otherwise provided in the act, be by ordinance. Section 73 provides that, after the approval of the act, no franchise or right to use the streets, etc., shall be granted by the board of aldermen for longer than 25 years. *Held*, that the incorporation by the state after the act went into effect of a telephone company to construct or otherwise obtain, own, and operate lines of electric telegraph and telephone did not give it the right to operate in the streets of New York City in the absence of a grant from the city by ordinance.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.\*]

2. TELEGRAPHS AND TELEPHONES (§ 10\*) — FRANCHISE — AUTHORITY TO USE STREETS—EXTENSION OF ROUTE CERTIFICATE.

The filing with the Secretary of State of an extension of route certificate by a corporation operating electric wires in a street after the act became effective gave no right to use the extended route, where there was no grant thereof from the city by ordinance; the extension being in effect simply an amendment of its original articles of incorporation.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.\*]

3. TELEGRAPHS AND TELEPHONES (§ 10\*) — FRANCHISE — AUTHORITY TO USE STREETS—NECESSITY FOR CONSENT OF LOCAL AUTHORITIES.

Laws 1881, p. 656, c. 483, in force until repealed by Laws 1909, c. 219 (Consol. Laws, p. 4613, c. 63), provides that any company incorporated under the laws of the state for the purpose of owning and maintaining a telegraph line or lines wholly or partly within the state may lay lines underground in any city, etc., within the state, provided that it shall before doing so first obtain from the common council, etc., permission to use the streets for the purpose. *Held*, that a burglar alarm corporation incorporated by the state in 1890 with power to use telegraph wires had no authority to use the streets of New York City, where it had not obtained the consent of the board of aldermen.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.\*]

Appeal from Special Term, New York County.

Application by the New York Independent Telephone Company for a writ of mandamus to compel the Commissioners of Water Supply, Gas, and Electricity of the city of New York to issue and deliver a permit. From an order denying the writ, petitioner appeals. Affirmed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Satterlee, Bissell, Taylor & French (William H. Page, of counsel, and G. H. Crawford and Joseph T. Taylor, on the brief), for appellant.

Francis K. Pendleton, Corp. Counsel (Theodore Connoly, of counsel, and Clarence L. Barbour, on the brief), for respondent.

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CLARKE, J.   In 1890 the Mercantile Safe Deposit Company, a corporation organized under chapter 613, p. 770, Laws 1875, entitled "An act to authorize the formation of corporations for the safe keeping and guaranteeing of personal property," and the several acts amendatory thereof and supplemental thereto, made application to the board of electrical control to place wires in the subway system, and in connection with such application filed with the board a communication dated February 18, 1890, signed by its president, Lyman Rhodes, which stated:

"We have had for many years by the approval of the police commissioners, electrical connections with the second precinct police station at the corner of Church and Liberty streets.   It is of the greatest importance that this telegraphic communication should be continued.   We have been giving burglar alarm service to the United States Trust Company, No. 47 Wall street, and we desire to render similar service to the United States subtreasury, with whom a contract was made some time ago for such protection.   We have also had applications from other financial institutions near us and it is our desire to extend our system to a limited extent in our neighborhood.   With your approval we would ask permission to go in the subway within the district bounded by Maiden Lane, Cortlandt street, Church street, Exchange Place, and William street.   This would cover the entire desired district."

The application was denied; the board of electrical control holding that it could not grant a permit to a company not authorized by its charter for the purposes sought.

On September 27, 1893, the company again made application to said board, signed by the president, in which it stated that it had safes, vaults, and other storage receptacles for the safe-keeping of personal property, and that for its protection it had hitherto, with the consent of the board of police, had telegraphic connection with the Second precinct station.   Among its customers it had the Subtreasury and the United States Trust Company, and that at the desire of these institutions their vaults had been or are about to be connected with the police burglar alarm of your petitioner, and it requested a permit to put its wires in the subway "to enable your petitioner to prosecute the transaction of the business for which it was organized, and for its protection therein and for the protection of the great amount of valuable property under its supervision."   This application was not granted.   On the 5th of April, 1894, a certificate of incorporation of the Mercantile Electric Company, signed by Mr. Rhodes and other persons interested in the Mercantile Trust Company, was filed with the Secretary of State; the amount of the capital stock being fixed at $5,000, and the purpose of the company being expressed to be that of "constructing, owning, using and maintaining a line or lines of electric telegraph or telephone, in the city of New York, and for the purpose of operating and conducting electric currents in and through the streets of the city of New York."   "The general route and the points to be connected are as follows:   From No. 120 Broadway in the city of New York, through Broadway to the Battery; through Pine street to Nassau street; to William street; through Nassau and Broad street to the East river; through William street to Hanover Square; through Wall street to Pearl street; through Pearl street to Cedar street;   through Cedar street to Broadway, connecting the United

States Subtreasury and various other buildings in the city of New York with a central office at No. 120 Broadway in said city of New York; and through such other streets in said city and connecting such other points with said central office or with other central offices in said city as the business needs and uses of said company may, from time to time, require." On April 7, 1894, the Mercantile Electric Company, by Lyman Rhodes, director and acting manager, asked the board of electrical control for permission or authority to have the necessary wires for the proper carrying on of its business placed in the subway. On June 29, 1894, the board passed a resolution authorizing and empowering the company "to lay and construct suitable wires or other conductors in subways under streets, avenues and public parks and places of the city of New York for conducting and distributing electricity for telegraphic and telephonic purposes under the direction of the board of electrical control, subject to all existing rules applicable thereto and to all regulations which this board may hereafter impose by regulation or otherwise," provided, however, that the electric conductors of the company should be laid through the subways constructed by the Empire City Subway Company.

The company thereafter applied to the Empire City Subway Company, Limited, for space in the electrical subways, as follows:

"No. 508, one three-inch trunk duct, Nassau street, east side, from N. E. corner of Cedar street to manhole S. W. corner Wall and Broad streets, No. 509, one three-inch trunk duct, Wall street south side, from manhole S. W. corner of broad street to manhole S. W. corner of Hanover street."

And on July 27, 1894, the company was notified that its application for space in such ducts had been granted. The wires were strung, and for a number of years the company maintained a burglar alarm system in said limited financial district. As explained by the electrician of the company, the telegraphic use of said underground wires was made by the transmission of signals from the office of the company's customers and from watchmen's call boxes to the signal devices of the company at its office, No. 120 Broadway. These signals were in some cases transmitted automatically, and in others by the manual pressing of electric push buttons. These signals consisted in causing certain numbers to appear at the company's switchboard, the meaning of which was known to the company's operator at the switchboard. The automatic signals were to indicate the opening and closing of vault doors in various bank and trust companies to protect the company's customers against burglary. The manual operation of said signals was used as a means of communication between the watchmen of the company from patrol boxes and other places upon the watchmen's routes and the company's office at 120 Broadway. The telegraphic use of said wires during said period consisted of the transmission of conversations between the watchmen of said company electrically from their several stations and the company's switchboard operator at 120 Broadway. The usual telephonic instruments consisting of transmitters and receivers were carried by the watchmen who connected them at their several stations as each conversation was had, and at the termination of which the watchmen disconnected said instruments.

On the 3d of July, 1905, the Mercantile Electric Company filed with the Secretary of State a certificate of extension of lines under which it purported to cover any and all of the public streets, avenues, highways, and other public places and waters in the city of New York from a point or points in said city to and connecting all other points in said city and in each and every borough thereof, the whole state of New York and from the most southerly point of Mexico to the most northerly point of Canada, and from the most westerly point of the United States and also of Canada to the most easterly point of the United States and also of Canada, and also by cable and other appropriate means with the rest of the known world. On the 20th of February, 1905, a certificate of incorporation of the New York Independent Telephone Company was filed with the Secretary of State, said corporation being organized for the purpose of constructing, buying, and leasing, or otherwise obtaining and owning lines of electric telegraph and telephone wholly within the limits of the state of New York, and also lines partly within and partly beyond the limits of said state, and of equipping, operating, and otherwise maintaining and using the same under and by virtue of the provisions of article 8 of the transportation law (Laws 1890, p. 1151, c. 566), and all other laws applicable to such a corporation. On the 7th of October, 1905, the New York Independent Telephone Company filed a certificate of merger with the Mercantile Electric Company with the Secretary of State, and on the 27th of September, 1905, there was executed by the Mercantile Electric Company a conveyance to the New York Independent Telephone Company of its "franchise, right, or consent to lay and construct suitable wires or other conductors in subways * * * granted * * * by a resolution of the board of electrical control" on June 29, 1894, its plant and switchboard located at 120 Broadway, and all the cables, wires, and other subsidiaries thereof, and "all other property, real, personal and mixed, and all other property rights, privileges and franchises, and all assets of every kind belonging to the Mercantile Electric Company." After the said merger, the New York Independent Telephone Company installed about 20 telephones in the district from 220 Broadway on the north to 25 Broadway on the south and 60 Wall street on the east. On July 3, 1907, it requested permission from the Commissioner of the Department of Water Supply, Gas, and Electricity to string a cable in the duct previously assigned to the Mercantile Electric Company from the manhole at the southeast corner of Wall and William streets to the manhole at the southwest corner of Wall and Hanover streets. Said application having been refused, the company applied for a peremptory writ of mandamus to compel the commissioner to grant the application, and from the order denying said application this appeal is taken.

What is directly involved is the right to place a three-fourths of an inch additional cable 225 feet long in a duct occupied since 1894. What is indirectly involved is whether a burglar alarm company operating in a very limited territory in the financial district has been transformed into a general telephone company possessing a franchise entitling it to occupy any and every street in Greater New York and extending over the whole of Mexico, the United States, and Canada,

whether it possesses without payment to the city of New York rights so extensive and so valuable that for such privilege another company has offered to pay $2,780,000. The determination that the company is entitled to a mandamus compelling the commissioner to grant the permit asked for necessarily involves the determination that the company possesses legally the broad franchise which it claims; for I see no escape from the proposition that, if it is authorized to compel the permit for 225 feet, it must have the right to compel a permit to place its wires wherever it wishes in the city of New York. So far as the New York Independent Telephone Company is concerned, it has no operating rights in the city of New York derived from its own incorporation, which occurred in February, 1905, because at that time the following charter provisions were in existence: Laws 1901, p. 36, c. 466, § 71:

"The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable."

Section 72:

"Every grant of or relating to a franchise of any character, to any person or corporation, must, unless otherwise provided in this act, be by ordinance."

Section 73:

"After the approval of this act no franchise or right to use the streets, avenues, waters, rivers, parkways, or highways of the city shall be granted by the board of aldermen to any person or corporation for a longer period than twenty-five years except, etc. * * * Every grant shall make adequate provision by way of forfeiture of the grant, or otherwise, to secure efficiency of public service at reasonable rates, and the maintenance of the property in good condition throughout the full term of the grant."

Section 88:

"All acts and parts of acts, so far as the same are inconsistent with this chapter, are hereby repealed."

In People ex rel. Independent Telephone Company v. Monroe, 30 N. Y. Law J. 488, where the relator had been incorporated pursuant to the provisions of the transportation corporation law (Laws 1890, p. 1136, c. 566) in 1899 after the taking effect of the Greater New York charter, the court at Special Term denied a motion for a mandamus, holding that the relator had not acquired an undoubted legal right to the use of the streets by virtue of its incorporation, but that right could only be granted in accordance with the provisions of the charter. This was affirmed (91 App. Div. 611, 86 N. Y. Supp. 1143) and the appeal dismissed (179 N. Y. 521, 71 N. E. 1137).

Nor do I think that the filing of the extension of route certificate by the Mercantile Electric Company can be availed of, for at that time also the charter was in force, and as said in the Matter of Brooklyn Q. C. & S. R. R. Co., 185 N. Y. 171, 77 N. E. 994:

"The certificate of extension which a corporation files [in that case a street railroad corporation] is in effect clearly and simply an amendment of its original articles of incorporation. Those original articles prescribe the line and extent of its proposed route. The certificate of extension prescribes the line and route of an additional road, and to that extent amends the original articles of incorporation. For the purposes of this provision, we think it may

naturally and easily be treated as an amendment to the articles of incorporation made to include the proposed extension, and the date of filing of which will fix the periods within which a corporation must act as to said extension."

Whatever rights to put its wires in the streets the relator possesses, as it seems to me, depend upon the original articles of incorporation of the Mercantile Electric Company and the law existing at the time of the filing thereof. The position of the respondent is that, while the company received its charter from the state, yet, to enable it to enjoy it in the city of New York, the consent of the local authorities of the city was required, which consent had never been applied for nor given. Therefore the company was not authorized to string wires in the street, and, as the commissioner's power to grant the permit was limited by statute to persons or corporations duly authorized to carry on the business of the character specified (section 469 of the Greater New York charter), it was his duty to refuse the application. At the time of the passage of the subway acts requiring wires to be placed under ground, as well as at the time of the consolidation into the greater city, there was some doubt as to who constituted the local authorities in the city of New York whose consent was required, and courts took different views. This question has, however, been settled definitely by the Court of Appeals in Ghee v. Northern Union Gas Co., 158 N. Y. 510, 53 N. E. 692. The court said:

"At the threshold of the consideration of these questions, it will be well to have in mind the legal effect of the consent which the municipal authorities are authorized to give by the transportation corporations act. It operates to create a franchise by which is vested in the corporation receiving it a perpetual and indefeasible interest in the land constituting the streets of a municipality. It is true that the franchise comes from the state, but the act of the local authorities, who represent the state by its permission and for that purpose, constitutes the act upon which the law operates to create the franchise. The state might grant the franchise directly to the corporation without the consent of the local authorities, and has done so in many instances; but the tendency of later years, which is well grounded in reason, is for the state to confer upon the local municipal authorities the right to represent it in the matter of granting franchises to the extent that the final act necessary to the creation of franchises must be exercised by such authorities. The legal effect of the consent therefore is the same as if the local authorities in form granted the franchise and the interest in the land. * * * We have had no difficulty in reaching the conclusion that the consent that is necessary to confer a franchise upon a gas lighting corporation can be given only by the municipal assemply through appropriate ordinances, but that when the consent has been granted to a corporation duly created, by which a corporate franchise, which is property, has been acquired, the administrative officers must be applied to for a permit that will allow the corporation to exercise such rights in order that the public convenience may be subserved. The permission forms no part of the franchise, and is not essential to its existence, and, if refused, the granting of it may be compelled by mandamus, as, indeed, it has been in a number of cases; but the officers to whom application must be made may within reasonable limits fix the time when work on the streets may be begun, determine what portion of a street shall be first opened, how much of it may be left open at a time, the depth of the trench, and other details, the careful regulation of which is of first importance to a metropolitan city like New York. And the sole purpose of these sections, as we read them, was to vest completely this important administrative power in the commissioner of public buildings, lighting, and supplies, and the commissioner of highways, leaving to the legislative department of the municipal government the power that

has always belonged to it, of performing such act as the state has declared to be necessary in order to create a franchise."

In People ex rel. West Side Electric Co. v. Consolidated Telegraph & Subway Co., 187 N. Y. 58, 79 N. E. 892, the West Side Company had in October, 1896, procured from the board of electrical control a permit which recited that the company had petitioned the board for a franchise to do business in the city and authorized it to lay suitable wires under the streets. It put its wires in the ducts of the defendant company and maintained them there, paying rent therefor, until 1903, when defendant refused longer to permit this occupancy upon the ground that the plaintiff had no legal authority. The court stated the question involved as follows:

"The rights of the parties to this litigation are dependent upon the question whether on October 30, 1896, the power to grant a franchise to lay and construct suitable wires or other conductors in subways under streets, avenues, public parks, and places in the city of New York for conducting and distributing electricity to a corporation organized under the transportation corporation law was vested in the board of electrical control in and for the city of New York or in the board of aldermen of said city."

And it applied the reasoning of the Ghee Case, supra, which affected a gas lighting company, to the case at bar where an electric lighting company was concerned, and held that the board of aldermen possessed the power, and affirmed the quashing of a mandamus.

But the appellant claims that it is expressly provided in the transportation corporation law, under which it was incorporated, that pipe lines and gas lines, and electric lighting lines and water pipes, must obtain the consent of the local authorities before they can occupy the public streets; but that section 102 of the transportation corporation law contains no such provision in regard to telegraph and telephone companies, and therefore its franchise was complete when given by the state. It was not called upon to apply for or receive any consent from the local authorities, but all that it was required to do was to apply as it has to the commissioner in his administrative capacity. It is true that the Court of Appeals in Village of Carthage v. Central New York Telephone Co., 185 N. Y. 448, 78 N. E. 165, 113 Am. St. Rep. 932, where the village had passed a resolution requiring a company which had long maintained its poles and wires in the streets to put them underground, said:

"It has long been the settled law of this state that telegraph and telephone companies derive the right to erect their poles and string their wires directly from the state. * * * We are of opinion that, while it is competent for the state to delegate its sovereign power to cities and villages in regard to the construction, management, and control of these companies, such surrender of sovereignty cannot be implied, but must rest on express legislation containing a clear and unqualified grant of power."

But neither in this nor in the cases in the Appellate Division—Barhite v. Telephone Co., 50 App. Div. 25, 63 N. Y. Supp. 659; New Union Telephone Co. v. Marsh, 96 App. Div. 122, 89 N. Y. Supp. 79—does it appear that the attention of the court had been directed to chapter 483, p. 656, Laws 1881, which provides that:

"Any company or companies organized and incorporated under the laws of this state for the purpose of owning, constructing, using and maintaining a

line or lines of electric telegraph within this state or partly within and partly beyond the limits of this state, are hereby authorized, from time to time, to construct and lay lines of electrical conductors underground in any city, village or town within the limits of this state, subject to all the provisions of law in reference to such companies not inconsistent with this act; provided that such company, shall, before laying any such lines in any city, village or town of this state, first obtain from the common council of cities, the trustees of villages or the commissioners of highways of towns, permission to use the streets within such city, village or town for the purposes herein set forth."

This act continued unrepealed until by chapter 219, Laws 1909, being chapter 63, p. 4613, of the consolidated laws (the transportation corporation law), it was annexed bodily to section 102. This is legislative recognition, as it seems to me, that telephone and telegraph companies have during all this period been governed by the same provisions requiring the consent of the local authorities as have the other companies which occupy the streets under the surface.

It follows that, when the original certificate was filed, there were existing provisions of law which required the consent of the local authorities, to wit, the board of aldermen, which consent was never applied for or granted.

As the appellant has not shown that it has a clear legal right to the mandamus applied for, the order appealed from should be affirmed, with costs and disbursements to the respondent. All concur.