(81 Misc. Rep. 636.)

### MURRAY v. NEW YORK TELEPHONE CO.

(Supreme Court, Special Term, Onondaga County.  July, 1913.)

1. TELEGRAPHS AND TELEPHONES (§ 33*)—GRANT OF FRANCHISE—IMPOSITION OF CONDITIONS.

Under Transportation Corporations Law (Consol. Laws 1909, c. 63) § 102, providing that underground electric lines may not be laid without obtaining permission of the common council of the city in which the proposed works are located, and the charter of the city of Syracuse (Laws 1893, c. 531), providing that no telephone wires shall be placed in conduits without first obtaining the consent of the common council of the city, the city of Syracuse may, on granting a franchise to a telephone company to construct subways in the streets of the city, impose conditions as to the rates to be charged telephone subscribers.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

2. TELEGRAPHS AND TELEPHONES (§ 33*) — ESTOPPEL TO DENY CORPORATE POWER.

A telephone company, which has accepted a franchise to construct subways in the streets of a city, cannot question the power of such city to impose a condition as to the rates to be charged telephone subscribers.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

3. TELEGRAPHS AND TELEPHONES (§ 33*)—TRANSFER OF FRANCHISES—DUTIES AND LIABILITIES OF SUCCEEDING COMPANY.

A telephone company, succeeding to the franchise of another telephone company to construct subways in the streets of a city, is bound by conditions in the grant of the franchise as to rates charged subscribers.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

4. TELEGRAPHS AND TELEPHONES (§ 33*)—RATES—CONDITIONS IN GRANT OF FRANCHISE—POWERS OF PUBLIC SERVICE COMMISSION.

In view of Public Service Commission Law (Consol. Laws 1910, c. 48) § 91, subd. 1, providing that all charges shall be just and reasonable, and no more than allowed "by law or order of the Commission," and subdivision 4, providing that the act shall not be construed to prevent a telephone company from carrying out contracts already made, a telephone company is not relieved from a condition in its franchise requiring it to furnish telephonic service at a specified rate by having filed with the Public Service Commission a schedule calling for a greater rate.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

5. TELEGRAPHS AND TELEPHONES (§ 33*)—RATES FOR TELEPHONIC SERVICE—RESTRAINING VIOLATION OF FRANCHISE.

An appeal to the Public Service Commission, under Public Service Commission Law (Consol. Laws 1910, c. 48) § 97, is not an exclusive or an adequate remedy to prevent a telephone company from violating a provision of its franchise limiting its rates for telephonic service, and hence does not prevent a telephone subscriber from resorting to injunction.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

6. TELEGRAPHS AND TELEPHONES (§ 33*)—RATES FOR TELEPHONE SERVICE—CONDITIONS IN GRANT OF FRANCHISE.

In 1887 the city of Syracuse granted a franchise to a telephone company to operate within the city on condition that a suitable and adequate telephone service should be given and that no more than a specified rate should be charged for a period of six years.  In 1897 the city granted

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a supplementary franchise for the construction of subways, subject to the condition that the former rates should not be increased. *Held*, that the rate as fixed by the franchise of 1887 must be continued, though more modern and approved appliances, such as metallic circuits and long-distance facilities, have been installed subsequent to the grant of the franchise in 1887.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

7. TELEGRAPHS AND TELEPHONES (§ 33*)—RATES FOR TELEPHONIC SERVICE—PRACTICAL CONSTRUCTION OF FRANCHISE.

The fact that a telephone company for a period of about seven years charged a rate for telephonic service in excess of that fixed in its franchise ordinance, and that during such period its right to make such charge was not contested, did not constitute a practical construction of the ordinance in favor of its right to increase its rate.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. § 33.*]

Action by Dwight H. Murray against the New York Telephone Company. Injunction granted.

Baldwin & Magee, Ray B. Smith, and William Rubin, all of Syracuse, for plaintiff.

Charles T. Russell, of New York City, and William Nottingham, of Syracuse, for defendant.

EMERSON, J. The Central New York Telephone & Telegraph Company on January 24, 1887, was granted a franchise by the common council of the city of Syracuse to construct, equip, and maintain a telephone plant, with necessary poles, cables, and wires, through, upon, and under the streets, squares, and public places in said city, upon condition, among other things, that said company should without delay install and equip a suitable and adequate telephonic plant in and for said city of Syracuse, and furnish all of its customers and patrons therein with the most modern and approved instruments and appliances for prompt, efficient, and satisfactory telephonic communication. The franchise fixed the central office or exchange of said company at the building known as the Wieting Block, and contained the further condition that for the period of six years from February 1, 1887, unless the company should in the meantime be required by law or municipal ordinance to put its system of wires underground, the total annual charge and expense of each customer or patron of the company for one full and complete set of instruments, with a separate and independent wire from the central office and for unlimited use within the boundaries of said city should not exceed the sum of $48, payable quarterly, for all stations within a radius of one-fourth mile from said central office.

The telephone company accepted said franchise with the conditions aforesaid, and proceeded to construct and equip a telephonic plant and lines in said city, and the same was completed with all reasonable dispatch. At the time this telephonic plant was completed and put into operation the art of telephoning was substantially in its infancy, and the instrumentalities then in use were, when viewed in the light

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of subsequent improvements, quite crude and undeveloped. The method of telephonic communication then in vogue was what was known as the ground return system; each end of the wire being grounded and the earth being used for the return circuit. As a part of the equipment each subscriber was furnished with a magneto upon his instrument, by means of which his call bell was rung, and the electrical energy was supplied by means of batteries at each subscriber's station. While this grounded system could not be utilized to any great extent for long-distance telephoning, it worked for some time comparatively well for local service. But with the advent of trolley cars, electrical lighting, and the multiplication of uses to which in modern times electricity has been applied, disturbances arose, largely due to excess currents of electricity in the ground, causing noises upon the wires, cross-talk between the wires, and sometimes affecting the instruments themselves, so much so as to cause the annunciator to drop down and thus indicate calls from patrons for the use of their line, resulting to a considerable extent in a meaningless confusion of signals and oftentimes shutting off the subscriber, when he called for a telephone connection, for the reason that his signal was already down. To overcome the difficulties which thus arose the common return ground wire system came in vogue about the year 1892. This change was effected by doing away with individual batteries and installing a central energy station from which electricity was supplied, and by discarding entirely the use of the ground for return circuit and installing in its place a common return wire, with which each station was connected, which wire was grounded near the central energy plant for the purpose of disposing of the surplus electricity which it gathered up on its return. These difficulties were largely eliminated by the use of this common return ground wire system, but not entirely, and in the progress of the art the next improvement was the metallic circuit system, which first came in use about the year 1894 and has proven a complete remedy. The metallic circuit system is created by discarding the return ground system entirely and by running a pair of wires, usually twisted together, from the central energy plant to the subscriber's station, whereby a complete metallic circuit is created.

The displacement by the latter system of the ground return and the common return ground wire system seems to have been slow, as the record shows that in August, 1897, there were in use 1,631 grounded circuits to 89 metallic circuits, of which about 25 were nonpaying, all of which were listed and utilized for long-distance telephoning, and for that purpose being supplied with a solid back transmitter, instead of the old Blake transmitter then in use upon the grounded circuits.

The rates for ordinary telephone service had not increased since the franchise of 1887 was granted, and the same remained at $48 a year within the quarter of a mile radius on August 2, 1897, save that for the metallic circuits on which the long-distance phones were then in use the company was then charging the sum of $80 per year.

In the year 1897 the telephone company contemplated placing all of its subscribers upon metallic circuits, and because of the vast increase

in the telephone business it became necessary to provide a subway for that purpose. The company thereupon petitioned the common council of the city for a franchise to that end, and on August 2, 1897, such a franchise was granted, permitting the company to construct and maintain a subway underneath the surface of the several streets and public squares for the uses of said company, subject, however, among other things, to the condition that said company should not increase its present rate for telephone service. This franchise and the conditions annexed were accepted by the telephone company, and it proceeded to excavate and construct the subway in question, and to build a building on Montgomery street, in which were installed the essential appliances for metallic circuit service; the same consisting mainly of a new distributing switchboard and power plant. The Montgomery street building was completed and occupied by the company about January 1, 1899, and on January 26, 1899, it announced a public opening of the new exchange. Steps were then taken by the company to substitute the metallic circuit service with apparatus for long-distance telephoning in place of the old ground service, which was largely accomplished by replacing the old Blake transmitter with the solid back transmitter so called. To this end the telephone company employed agents or solicitors to interview the subscribers, and procured their consent to the change, and by dint of such exertions, through persuasion in some cases, and by threats to remove the instruments and discontinue their telephone service in other cases, the grounded service was rapidly eliminated and the subscribers placed upon metallic circuits with long-distance telephone service. Contracts for this improved service were procured to be executed in the manner above stated, which fixed the maximum charge within the one-fourth mile radius at the sum of $80 per year. The effect was that, in addition to the local service previously enjoyed by this change in system, subscribers acquired a long-distance telephone service at their stations, and, as the telephone company belonged to the Bell system, so called, this long-distance service covered substantially all of the United States east of the Rocky Mountains.

On January 1, 1898, at the time the telephone company took possession of its new plant, there were 80 metallic and 1,649 grounded circuits in their telephone system. Thereafter the work of changing to metallic circuits proceeded with such rapidity that on January 1, 1902, there were 1,830 metallic and 177 grounded circuits; on January 1, 1905, there were 4,689 metallic and 28 grounded circuits; and on January 1, 1906, there were 6,946 metallic and no grounded circuits in operation.

Notwithstanding the changes thus made, the telephone company still made some contracts at the old rate. Among these contracts was one made with the plaintiff on July 25, 1905, for telephone service on a direct one-party line with metallic circuit for the sum of $48 per year, said contract to run one year and thereafter until terminated on ten days' notice. This contract specified upon its face that it was a special physician's rate.

The defendant, the New York Telephone Company, having in the meantime become the owner of all the stock of the Central New York

Telephone Company, the latter company was on September 21, 1909, by proceedings duly had under the Stock Corporation Law, merged in the former, and all of the property of the latter was duly conveyed to the former corporation. Since said merger the defendant has been the only telephone company furnishing service in said city of Syracuse.

The plaintiff is a physician and surgeon in said city, having his offices in the University Block, which is within the one-fourth mile radius mentioned in the franchise of 1887. As such physician and surgeon a telephone service is necessary in his business, and he has had the same since the year 1885. In August, 1897, such service was furnished by the Central New York Telephone Company, which was prompt, efficient, and satisfactory. This service was continued at the rate of $48 per year until 1900, when the company demanded an increase to $83 a year, which plaintiff declined to pay, and his telephone was removed from his offices. The plaintiff thereafter used an independent line until July, 1905, when the contract above mentioned was made with said company, which was continued down to January, 1912. At the latter date the plaintiff was notified by defendant that he must thereafter pay at the rate of $60 a year or his contract would be terminated. The plaintiff notified the defendant that he would sign a contract for the increased rate under protest as to rates, which he did on January 30, 1912. This contract called for sum of $60 per year, payable in monthly installments, and under this contract the plaintiff paid for the months of February and March, 1912. Not having paid the $5 due for the month of April the company notified him on April 18th that if it was not paid by April 23d his service would be suspended. The plaintiff paid this sum, and later on paid a like sum for the month of May, all of which payments were made under protest at the time.

On May 20, 1912, the plaintiff served a notice on defendant that he elected to terminate the agreement aforesaid, but stated that he was willing to pay $48 a year, payable quarterly in advance, and would sign a contract to that effect. This the defendant refused to accede to, and threatened to remove the telephone from the plaintiff's premises. The plaintiff then served a written demand on defendant that it furnish him one full and complete set of instruments, with a separate and independent wire from the central office to plaintiff's rooms in University Block, with appliances for prompt, efficient, and satisfactory telephonic service and communication within the territorial limits of said city upon a grounded line circuit or any service equally as prompt and efficient as that which was furnished by the Central New York Telephone Company on August 2, 1897, and he thereupon made a tender of the sum of $12 for the first quarterly payment in advance. The defendant declined to accept the payment or to furnish the service requested, and again threatened to remove the telephone from the plaintiff's premises on June 1, 1912. The plaintiff thereupon brought this action to restrain such removal, and procured a temporary injunction to that effect, which has been continued by stipulation during the pendency of this action without prejudice to the rights of either party to this litigation.

[1, 2] At the threshold of this investigation the question arises as to the power of the common council in granting the franchises to exact the conditions in question. As to this there would seem to be no room for doubt. Granting that, as far as streets and highways are concerned, the franchise of a telephone company is derived from the Legislature, the right to occupy squares and public places is nowhere conferred by legislative grant. This power can only be exercised by municipal authority, and where a telephone company petitions for the same the granting of the right is sufficient consideration to uphold such restrictions and conditions as are imposed by the municipality and are accepted by the company. Henceforth the company is estopped from insisting upon want of authority to impose the condition. Rochester Telephone Co. v. Ross, 125 App. Div. 76, 83, 109 N. Y. Supp. 381, affirmed 195 N. Y. 429, 88 N. E. 793; New Union Tel. Co. v. Marsh, 96 App. Div. 122, 89 N. Y. Supp. 79; Barhite v. Home Telephone Co., 50 App. Div. 26, 63 N. Y. Supp. 659; Farnsworth v. Boro Oil & Gas Co., 76 Misc. Rep. 37, 134 N. Y. Supp. 348; City of Buffalo v. Frontier Tel. Co., 203 N. Y. 589, 96 N. E. 1112.

Especially is this so as to the franchises of 1897, authorizing the construction of a subway and conduits, when we consider the provisions of chapter 483, Laws of 1881, since incorporated in section 102 of the Transportation Law (Consol. Laws 1909, c. 63), to the effect that underground electric lines could not be laid without obtaining permission from the common council of the city where it was proposed to lay the wires. Matter of New York Independent Telephone Co., 133 App. Div. 635, 645, 118 N. Y. Supp. 290, affirmed on opinion below 200 N. Y. 527, 93 N. E. 1126.

In this regard the charter of the city of Syracuse fully accords with the limitations contained in the act of 1881, as by chapter 531, Laws of 1893, amending said charter, it is provided that no telephone wires should be placed in conduits without first obtaining the consent of the common council of that city. Under this statutory authority the power to exact the conditions in question is undoubted. City of Buffalo v. Stevenson, 207 N. Y. 258, 100 N. E. 798.

[3] So also it would seem to be entirely clear that these conditions are binding upon the defendant as the successor in interest of the Central New York Telephone Company, and that for a refusal to abide by the terms thereof any inhabitant of the city whose interests were affected could maintain an action for a prohibitory or mandatory injunction. Pond v. New Rochelle Water Co., 183 N. Y. 330, 76 N. E. 211, 1 L. R. A. (N. S.) 958, 5 Ann. Cas. 504, affirmed 143 App. Div. 70, 127 N. Y. Supp. 582; Davis v. Zimmerman, 91 Hun, 489, 492, 493, 36 N. Y. Supp. 303; Wright v. Glen Telephone Co., 112 App. Div. 745, 746, 99 N. Y. Supp. 85; Sterne v. Metropolitan Telephone & Telegraph Co., 19 App. Div. 316, 46 N. Y. Supp. 110; Howard v. City of Buffalo, 151 App. Div. 198, 122 N. Y. Supp. 1095, 135 N. Y. Supp. 303; McEntee v. Kingston Water Co., 165 N. Y. 27, 58 N. E. 785; Bremer v. Manhattan Ry. Co., 191 N. Y. 334, 337, 84 N. E. 59; Joy v. St. Louis (C. C.) 122 Fed. 524, affirmed 138 U. S. 1, 47, 50, 11 Sup. Ct. 243, 34 L. Ed. 843; Richman v. Consolidated

Gas Co., 186 N. Y. 209, 78 N. E. 871; Public Service Com. v. Westchester St. R. R. Co., 206 N. Y. 210, 99 N. E. 536.

[4] Nor were the conditions exacted in granting said franchises at all modified or released by the action of defendant in filing with the Public Service Commission the rate of $60 per year for the service which is demanded by plaintiff. In accepting these conditions the defendant incurred contract obligations to that extent, and could not on its own initiative avoid those obligations by filing with the Public Service Commission a contrary rate. That the Public Service Commissions Law (Consol. Laws 1910, c. 48) did not intend any such anomalous result is manifest by subdivision 1 of section 91, which provides that all charges shall be just and reasonable and no more than allowed by law *or order of the commission,* and subdivision 4 of the same section, which provides that the act shall not be construed to prevent a telephone company from carrying out contracts already made. Laws 1910, c. 673, § 91.

And, indeed, were it otherwise, the statute in this regard would be in plain violation of the Constitution. Simons Sons Co. v. Maryland Telephone & Telegraph Co., 99 Md. 173, 57 Atl. 193, 63 L. R. A. 727; City of Superior v. Douglass County Telephone Co., 141 Wis. 363, 122 N. W. 1023; Walla Walla City v. Walla Walla Water Co., 172 U. S. 2, 9, 19 Sup. Ct. 77, 43 L. Ed. 341.

I do not regard the case of Chesapeake & Potomac Telephone Co. v. Manning, 186 U. S. 238, 22 Sup. Ct. 881, 46 L. Ed. 1144, as at all antagonistic to the views above expressed. That case did not involve any contractual liability arising from the acceptance of a franchise, but was based entirely upon the power of Congress arbitrarily to fix the rates for telephone service without inquiry into the reasonableness of the same.

[5] Nor do I think an appeal to the Public Service Commission was an exclusive or even an adequate remedy in this case. The functions of that commission are of a legislative character, and their duty when complaint is made as to rates is to determine the reasonableness of the same and to fix the amount of such rates upon a reasonable basis, having regard to just and fair returns for the property invested. Public Service Commissions Law (Laws 1910, c. 673), § 97; People v. Public Service Com., 153 App. Div. 130, 138 N. Y. Supp. 434.

The rights of the plaintiff in this case do not arise out of the failure of defendant to adopt reasonable rates, but out of the contract obligation of defendant, which neither the Public Service Commission nor even the Legislature itself has power to modify or restrict. Nor do I find that the Commission has anywhere been invested with judicial power to declare and enforce contract rights. On the contrary, the act itself provides that, if the Commission shall be of the opinion that a telephone company is failing or omitting to do that which is required by law, it shall direct an action to be brought in the Supreme Court to prevent such violation either by mandamus or injunction. That the Public Service Commission would be powerless to grant relief in this case is manifest from the decision in Public Service Commission v. Westchester St. R. R., 206 N. Y. 209, 99 N. E. 536, where

the Commission itself brought an action to restrain the violation of a contract right of the nature of the one now before the court. Being without power to enforce its judgment, except by appeal to the courts, it is clear that a proceeding before the Public Service Commission would not furnish an adequate remedy at law, even though the Commission had jurisdiction of the matter in question.

[6] This now brings us to the crucial question in this case, and that is whether the acts of the defendant constitute a violation of the conditions contained in the franchise of 1897. By that franchise the defendant's predecessor bound itself not to increase its then existing rate for telephone service, and in order to determine whether the defendant has violated the franchise we must first consider what the parties understood to be the then existing rate for telephone service. In determining this question we must bear in mind that the two franchises must be construed together, as they are both part and parcel of the authority under which defendant and its predecessor proceeded. From the franchise of 1887 we learn that its purpose was to provide for a suitable and adequate telephone service in and for the city of Syracuse and adjacent country, and the agreement of the telephone company was to furnish a suitable and adequate telephonic plant for said city and to furnish all of its customers and patrons with the most modern and approved instruments and appliances for prompt, efficient, and satisfactory telephonic communication. The company further agreed that for the period of six years the total annual charge to each patron within a one-fourth mile radius from the central office for one full and complete set of instruments with a separate and independent wire for unlimited use should be the sum of $48. At the time this franchise was granted all of the telephones were constructed on the grounded circuit system; but this system was later supplanted by the common return ground wire system, which was principally in use at the time the franchise of 1897 was granted. Down to that time the rate fixed in the franchise of 1887 had not been changed, except that, the existing system having been found imperfect for long-distance telephoning, the company had installed a limited number of metallic circuits equipped with solid back transmitters, instead of the old Blake transmitter, which furnished a long-distance telephone service for each patron on such metallic circuit at his individual station. This service was listed by the telephone company as long-distance subscribers, and for the same the company first made a charge of $100 per year, which later was reduced to $80 and then to $60 per year.

The number of grounded circuits or common return ground wire circuits in operation at that time was about 1,600, all of which were substantially devoted to local telephoning, and, so far as the evidence discloses, furnished at that time prompt, efficient, and satisfactory telephone service. The number of metallic circuits, each furnished with a long-distance transmitter, then in operation, was about 75 or, in other words, about 95 per cent. was devoted to the local service and a little less than 5 per cent. to the long-distance service.

These, then, were the conditions which existed when the franchise of 1897 was granted, and as the declared purpose of the franchises

was to furnish a local service, and as the great prevailing service at the time was of a local character, the inevitable conclusion must be that this was the service which the parties had specifically in mind when the condition against increasing the then existing rate for telephone service was embodied in the franchise. But it is said that with the progress of time, and the multiplication of the uses of electricity, the old grounded circuit and common return ground wire system became impracticable, and therefore the telephone company was obliged to replace the same with the metallic circuit system, which, with the use of the solid back transmitter, places all the patrons on the longdistance list, and, therefore, the defendant is entitled to charge the long-distance rate which existed when the franchise was granted.

The answer is that the defendant has no right to place any subscriber on the long-distance list and charge him long-distance prices without his consent. Granted that it was necessary for the defendant and its predecessor to replace the old grounded system with the metallic circuit, this was no more than the company was obliged to do by the franchise of 1887. Under that franchise the obligation existed to furnish customers with the most modern and approved instruments and appliances for prompt, efficient, and satisfactory telephonic communication. This was not satisfied by merely installing in the first instance such instruments and appliances, but the purpose was to keep up the efficiency of the service, and to that end it was a continuing obligation upon the company to keep up with all advancements and improvements in the art and to avail itself of the same when necessary to prompt, efficient, and satisfactory telephonic communication. True, the company was not bound to install a long-distance telephone transmitter for a local customer, unless such a transmitter was essential to prompt, efficient, and satisfactory local service; but if a change to the metallic circuit system became necessary, in order to give good local service, the obligation to make the change rested upon the company in virtue of the original franchise.

Again, the defendant contends it has not raised the rate for telephone service, because the present rate for long-distance telephoning was in existence when the franchise was granted. In other words, the defendant contends that at that time there were two kinds of service furnished by the company, one of a local character and cheaper grade, and the other of a long-distance character, for which a higher price was charged, and they contend that the mere elimination of the cheaper grade and putting all the subscribers upon the higher and more expensive service is not increasing the rates for telephone service within the meaning of the franchise. I do not so understand the case. Suppose a railroad corporation receives a franchise to operate a line of railroad on condition that passengers shall not be charged more than two cents a mile for transportation. The company installs a line of common coaches for transportation, in which it charges two cents per mile, and also installs a line of Pullmans, for which service it charges three cents per mile. Later on the company withdraws all the common coaches, and thus drives all of the passengers into Pullman coaches, for which service it compels them to pay three cents

per mile. Would any one hesitate to denounce this as a violation of their franchise?

The case thus supposed seems to be an absolute counterpart to the one here presented. While I do not find that this question has before arisen in this state, the views above expressed find confirmation in the decisions of some of our sister states. In the case of the Chicago Telephone Co. v. Illinois Manufacturers' Association, 106 Ill. App. 54, 62–65, a bill was filed to enjoin the Chicago Telephone Company from exacting a greater rate than $125 per year for telephone service, as fixed by the terms of the city ordinance, and from removing the telephone appliances and apparatus from complainant's place of business, and from cutting off his telephone service. It was held that the company had no right to raise its rates because it had improved the service by substituting metallic circuits for the grounded wire system that was in vogue when the ordinance was passed granting the franchise; that the metallic circuit was but an improvement of telephone service over the grounded line system; that the restriction in the ordinance meant that the company should not increase the rates which it was charging when the ordinance was passed for telephone service, and that the telephone service intended was not the particular service then being rendered, but was as well any improved telephone service which the company might thereafter adopt and put in use whatever might be the appliances and instruments used to improve it and make it more efficient and satisfactory than the service in use when the franchise was granted; that the words "telephone service" meant a service by an organized apparatus and, whatever changes might be made therein by the addition of wires, apparatus, or appliances for the purpose of rendering it more efficient, it was still a telephone service within the meaning of the ordinances after the change as before; that the word "telephone" constituted a generic term, having reference generally to the art of telephoning as an institution, but more particularly to the apparatus ordinarily used in the transmission as well as reception of telephone messages; that, as generally accepted, the meaning of the word was an organized apparatus as an institution and not as a single instrument.

In the case of People v. Chicago Telephone Co., 220 Ill. 238, 77 N. E. 245, an information in the nature of a quo warranto was filed by the people of the state of Illinois against the Chicago Telephone Company for the purpose of declaring a forfeiture of the franchise of the company and also of its rights to exercise such franchises in the public streets of the city under an ordinance passed January 4, 1889, on the ground that the company had misused and abused its franchise by demanding and receiving unlawful rates for telephone service. In this case an ordinance had been passed by the city of Chicago, and accepted by the telephone company, which granted permission to the company to construct and maintain, repair, and operate its lines of wires in the public streets, by means of underground conduits in parts of the city and by means of poles and wires in other parts, upon condition, among other things, that the company should not increase to its present or future subscribers the rates for telephone

service then established. It was held that the telephone service named in the ordinance meant the general telephone service furnished by the company during the period of the grant, and not merely the kind of service with the kind of appliances and equipments which was furnished when the ordinance was passed; that the words "telephone service" included any improved service adopted by the company; that improved transmitters, receivers, switchboards, and metallic circuits are the means and appliances for such telephone service, and nothing else; that under the ordinance, while the company could not be required to adopt improvements in its service or equipments or to keep up with the general progress of the business, yet, if it saw fit to adopt improvements and furnish a better grade of telephone service, it could only have the benefit of the ordinance granting it the right to use the public streets by complying with the terms of the ordinance and not increasing the rates. It was accordingly held that where the grounded circuit was in use at the time the ordinance was passed, which was afterward changed to a metallic circuit, this did not give the company a right to increase the rates for such improved telephone service. See, also, to like effect, Central Union Telephone Co. v. Bradbury, 106 Ind. 1, 9, 5 N. E. 721; Johnson v. State, 113 Ind. 143, 15 N. E. 215; Central Union Telephone Co. v. State, 118 Ind. 194, 206, 19 N. E. 604, 10 Am. St. Rep. 114; Simons Sons Co. v. Maryland Telephone & Telegraph Co., 99 Md. 141, 57 Atl. 193, 63 L. R. A. 727.

[7] The suggestions of defendant's counsel that a practical construction results from the long delay in contesting the increased rates, and also that the public are estopped by acquiescing in the same, are so fully met by the decisions in the Illinois cases that nothing further need be said upon the subject.

It follows that the plaintiff is entitled to a prohibitive injunction enjoining and restraining the defendant from discontinuing its telephone service at the plaintiff's office, and from removing therefrom the telephone instruments and appliances requisite to such telephone service, and also to a mandatory injunction commanding the defendant to furnish the plaintiff at his office in the University Block, city of Syracuse, one full and complete set of telephone instruments, with a separate and independent wire from the central office for unlimited use within the boundaries of said city, together with such improvements on the same as have been adopted by defendant and are in general use for its local service, and to furnish to plaintiff a telephone service as prompt, efficient, and satisfactory as that which was furnished him by the Central New York Telephone & Telegraph Company on August 2, 1897, upon payment or tender to defendant of the sum of $48 per annum, payable quarterly in advance, together with costs.

Findings may be prepared in accordance with the foregoing opinion, and, if not assented to, the same may be settled before me on five days' notice.

Judgment accordingly.