its Legislature takes the mine from the control of the owner and vests it in the mine foreman so exclusively that the master may not interfere, it also prevents the master from making any provision for the protection of men who, from time to time, may go into the mine for the purpose of seeking work. For the purpose of such visit the whole system for conducting the mine, commanded by the state, cannot be recast and the control taken from the mine foreman and reinvested in the owner. The statute is for the benefit of miners, but the enjoyment necessarily places the mine for all purposes, and as to all men visiting it, under the dominion of the mine foreman, so far as the statute imposes duties upon him. Indeed, the plaintiff entered under the auspices of the foreman.

These conclusions lead to the affirmance of the judgment, with costs. All concur.

———

(160 App. Div. 771)

PEOPLE ex rel. EAST RIVER TERMINAL R. R. v. STATE BOARD OF TAX COM'RS (CITY OF NEW YORK, Intervener).

(Supreme Court, Appellate Division, Second Department. February 27, 1914.)

1. TAXATION (§ 117*)—SPECIAL FRANCHISE—DEFENSES—"LAND"—"REAL ESTATE"—"REAL PROPERTY"—"SPECIAL FRANCHISE."

Under Tax Law (Consol. Laws, c. 60) § 2, subd. 3, declaring that the terms "land, real estate and real property" shall include all surface or elevated railroads, including the value of all franchises, or permission to maintain the same on streets, and all railroad tracks, switches, etc., permitted to be laid in any public road, and that such franchise right or permission shall, for purposes of taxation, be known as a "special franchise," a terminal company, maintaining tracks upon public streets by permission of municipal authorities, must be deemed to operate such tracks solely by permission of the public authorities, and hence is liable to a special franchise tax.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 214; Dec. Dig. § 117.*]

2. TAXATION (§ 171½*)—FRANCHISE TAX—USE OF STREET—ESTOPPEL.

A terminal company which did not affirmatively assent to the contention of city authorities that some of the streets used by it were public streets, but which acted as if it acquiesced in such contention and under the permission of such authorities, was estopped, for the purpose of a proceeding to assess a special franchise, from claiming that they were not public streets.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 171½.*]

3. RAILROADS (§ 79*)—FRANCHISE—FORFEITURE.

Whether a terminal company is exceeding its corporate powers in attempting to operate tracks through certain public streets is a matter to be determined in an appropriate action by the Attorney General in the name of the people of the state.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 192, 193, 202, 203; Dec. Dig. § 79.*]

Appeal from Special Term, Kings County.

Certiorari by the People of the State of New York, on the relation of the East River Terminal Railroad, against the State Board of Tax Commissioners, in which the City of New York intervened

———

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

(assessment of 1910). From a final order of the Special Term (140 N. Y. S. 722) dismissing the writ, relator appeals. Affirmed.

Argued before JENKS, P. J., and BURR, CARR, STAPLETON, and PUTNAM, JJ.

H. B. Closson, of New York City (Jarvis P. Carter, of New York City, on the brief), for appellant.

Curtis A. Peters, of New York City (Addison B. Scoville and William A. McQuaid, both of New York City, on the brief), for respondents City of New York and State Board of Tax Com'rs.

BURR, J. Prior to February 16, 1910, relator was maintaining certain railroad tracks upon and over certain streets in the borough of Brooklyn, and was operating cars over the same with steam as a motive power. Seven of these tracks crossed Kent avenue, between North Third and North Fourth streets; four of these tracks crossed Wythe avenue, which is the next avenue east of and parallel to Kent avenue, and were continuations of some of the tracks crossing Kent avenue to the west, and one track crossed North Fourth street diagonally between Kent and Wythe avenues, this being also a continuation of one of the first seven named tracks. In addition to these 12 tracks relator was also maintaining tracks and operating cars over the same with steam as a motive power, across Kent avenue between North Fifth and North Sixth streets, across Wythe avenue, between the same streets, and along North Fifth, North Sixth, North Seventh, North Eighth, and North Ninth streets for a portion of the distance between the river and Kent avenue, and also between Kent avenue and Wythe avenue. It would appear from the agreed statement of facts herein that the property bounded by North Third and North Fourth streets, the East river, and a line drawn parallel with Wythe avenue and more than 100 feet easterly therefrom, together with the greater portion of the property between North Fifth and North Tenth streets, west of Kent avenue, and between that and the East river, as well as a considerable portion of the property between North Fifth and North Sixth streets, between Kent avenue and a line drawn east of Wythe avenue and several hundred feet distant therefrom and parallel thereto, is owned or controlled by individuals or copartners, and is used by them or their transferees as an extensive freight depot and yard, which is almost entirely covered with tracks and switches, with some of which each of the tracks in the streets last above enumerated are connected, and that from this yard as a center 1,500,000 tons of freight are annually received and distributed.

In the year 1910, the State Board of Tax Commissioners assessed relator for a special franchise in connection with constructing, maintaining, and operating these tracks, and also certain scales used in connection therewith, situated in some of these streets, in the sum of $75,000. Both relator and respondent agree that the use of the railroad crossings, hereinbefore specifically described as the 12 tracks between North Third and North Fourth streets, constitute a special franchise, subject to assessment for taxation at the amount of $10,-200. Relator denies that it is subject to assessment or tax as to the

146 N.Y.S.—8

remainder of the tracks across or upon either of the other streets, or upon the scales, but at the same time it does not dispute the amount of the assessment fixed by the State Board of Tax Commissioners, if it is liable to such tax. Relator was incorporated in November, 1907, under the then existing Railroad Law (General Laws, c. 39 [Laws of 1890, c. 565, § 2]), for the purpose of building, maintaining, and operating a steam railroad, to be operated as a freight railroad exclusively. Its route was thus described: Beginning at—

"a point on the easterly bank of the East river between North Third street and North Fourth street as its western termini [sic], running thence easterly about one-half mile to a point east of Wythe avenue between North Third and North Fourth streets, which said last point will be the eastern termini [sic] of said road."

Thereafter, and in June, 1908, it applied to the Public Service Commission of the First Department, under section 59 of the said Railroad Law, and section 80 of the Public Service Commission Law (Laws of 1907, c. 429), for a certificate of public convenience and a necessity, which, on December 4, 1908, was granted. In March, 1909, it obtained from the city of New York, pursuant to the terms of a contract entered into by it with said city, bearing that date, and which was authorized by the Board of Estimate and Apportionment of said city, the right and privilege to construct, maintain, and operate said 12 railroad tracks hereinbefore described, and thereafter, and in June, 1909, it obtained from the Public Service Commission, pursuant to the provisions of section 53 of the Public Service Commission Law (supra), its permission to exercise the right given to it under said contract. In the succeeding September, the Board of Estimate and Apportionment adopted a resolution relative to the tracks upon the remaining streets hereinbefore described, asserting that such use was without authority, and calling upon those who were operating the same to obtain legal right to do so. It would appear that the firm of Havemeyers & Elder, or those claiming under them, had for several years maintained this freightyard and these tracks, and operated cars over the same. As to some of these streets the said firm contended that they were the owners of the land within the boundaries thereof, and that said streets between Kent avenue and the East river had never been legally opened, and that as to the other streets in preceding years the board of aldermen of the former city of Brooklyn had adopted resolutions giving authority to them, or those through whom they claimed, to construct such tracks. Thereafter the corporation counsel of the city advised the Board of Estimate and Apportionment that whether or no all of the streets had been opened by legal special proceedings, they had become public streets by dedication and acceptance, and that the resolutions adopted by the board of aldermen of the city of Brooklyn were wholly ineffectual to confer any right to construct or maintain tracks over or upon such streets. Apparently acquiescing in this contention, steps were then taken in behalf of those using said streets to obtain a legal right to maintain such tracks and operate cars over the same. The East River Terminal Company, the relator here, to whom the previous franchise had been

granted, having obtained the necessary consents of abutting property owners, filed a paper designated as a certificate of extension, under section 90 of the Railroad Law, in which it designated, as extensions of its then existing and operated railroad, such portions of the tracks used in connection with those tracks in the freightyard above described as lay within the boundaries of the several streets north of North Fourth street. Asserting the fact of the filing of such certificate of extension, it then applied to the Board of Estimate and Apportionment for authority to maintain and operate tracks in said streets as said tracks were then constructed (with some slight changes, here unimportant), and such consent was granted, and the mayor was authorized in behalf of the city of New York to execute a contract with relator, similar in form to that which was executed with reference to each of the 12 tracks between North Third and North Fourth streets, and thereupon each of the resolutions theretofore adopted by the board of aldermen of the city of Brooklyn, purporting to confer authority to maintain such tracks, was by resolution of the said Board of Estimate and Apportionment expressly rescinded. Pursuant to such authority, on December 27, 1909, relator and the city of New York executed said contract, and by it the former was given authority to construct and maintain said tracks and operate cars over the same, upon certain terms and conditions, and upon the payment of certain specified sums, which terms and conditions relator accepted and agreed to perform, and which payments it agreed to make. Up to the time when the tax for the special franchise for the year 1910 was imposed, no application had been made to the Public Service Commission for a certificate of public convenience and a necessity. Subsequently, and in August, 1911, such application was made upon a petition by relator, addressed to it, alleging that it had procured from the city of New York a consent or "franchise to construct, maintain and operate a steam railroad in the streets and avenues hereinafter mentioned," and then follows a specification of the streets and avenues referred to in said contract and in its certificate of extension of route. This petition omitted to state any proceedings on the part of the relator to file the so-called certificate of extension, or to procure by such filing a right from the state to construct and maintain said tracks. The Public Service Commission called attention to such omission, and suggested the amendment of the petition. It does not appear that anything further has been done in connection with the procuring of such certificate. Although relator is still maintaining and operating a railroad over and through such streets, it now contends that its so-called certificate of extension, filed in the autumn of 1909, purporting to amend its charter, is inoperative and void: First, because the right to file such certificate of extension is given only to street surface railroads, and not to a steam road (Railroad Law, §§ 90, 91); second, that when the route or main line of a railroad is less than two blocks in length, the construction of additional tracks paralleling the main road, at the lateral distance of one, two, three, four, or five blocks from such main road, each nearly as extensive as the main road itself, neither of which can be said to be an appendage of the others nor

connected with each other, nor with the main road, cannot be "such additions, betterments and facilities as may be necessary or convenient for the better management, maintenance or operation" of the original railroad (Railroad Law, supra, § 7, as amended Laws of 1905, c. 727); third, that as the contract of December 27, 1909, contained a provision that it should not limit the present or future jurisdiction of the Public Service Commission, and was upon the further and express condition that the provisions of the Railroad Law pertaining thereto should be strictly complied with, in the absence of a certificate from the Public Service Commission the relator cannot be said to have secured any such right to operate its railroad in said streets as subjects it to a tax for a special franchise.

We believe none of these contentions to be well made. Whether relator's original certificate of incorporation has been properly amended, whether these additional tracks may be said to be betterments and facilities necessary or convenient for the management, maintenance, and operation of its original railroad, and whether the consent given by the city of New York is complete or imperfect until the Public Service Commission has also acted, we need not now determine.

[1-3] The terms "land," "real estate," and "real property," as used in the Tax Law, include, among other things—

"all surface, underground or elevated railroads, including the value of all franchises, rights or *permission* to construct, maintain or operate the same in, under, above, on or through, streets, highways or public places; all railroad structures, substructures and superstructures, tracks and the iron thereon; branches, switches and other fixtures *permitted* or authorized to be made, laid or placed in, upon, above or under any public or private road, street or ground. * * * A franchise, right, authority or *permission* specified in this subdivision shall for the purpose of taxation be known as a 'special franchise.' " Tax Law, Consol. Laws, c. 60 (Laws of 1909, c. 62) § 2, subd. 3.

It seems to be the fact that the relator, when this tax was imposed, was maintaining and operating over these tracks upon these various streets, at least by *permission* of the municipal authorities having to do with the subject-matter, and that this is its only present authority for so doing. It asserts that it is not a trespasser. Then whence comes its privilege in these streets? If it did not affirmatively assent to the contention of the city authorities that the land within the lines of some of the streets had been dedicated to public use, and such dedication accepted, so that they became public streets, at least they did not assert or stand upon any right to use the same, independent of their consent. It proceeded to act as if it acquiesced in their contention, and for the purposes of this proceeding it must be deemed estopped from claiming that they are not public streets. People ex rel. N. Y. C. & H. R. R. R. Co. v. Priest, 206 N. Y. 274, 99 N. E. 547. If it did not admit that the authority attempted to be conferred by the resolutions of the board of aldermen of the former city of Brooklyn was valueless, it did not assert any right thereunder, or seek to review or control the action of the Board of Estimate and Apportionment in attempting to destroy any semblance of authority thereunder by re-

scinding the same. If, on the other hand, these resolutions were valid, these might constitute such necessary permission by the public authorities as would make such use of the streets a special franchise. If relator is exceeding its corporate powers in attempting to maintain and operate a railroad through these streets, that is a matter to be determined in an appropriate action, brought by the Attorney General in the name of the people of the state. City of New York v. Bryan, 196 N. Y. 158, 89 N. E. 467. So long as this color of authority exists, and the privileges attempted to be conferred thereby are not withdrawn, and so long as relator does not remove its tracks and cease to operate its railroad upon these streets, but insists upon so doing, it must be deemed to so operate solely by favor of the public authorities and by reason of their permission, and not by reason of any estate or interest in the land itself over which it is operating its road, or with any other right as its basis. People ex rel. Met. St. Ry. Co. v. Tax Com'rs, 174 N. Y. 417, 67 N. E. 69, 63 L. R. A. 884, 105 Am. St. Rep. 674. In so doing it avails itself of a privilege to do something in the public streets and places not permitted to citizens generally, and this not by virtue of any independent right or authority in the matter (People ex rel. Long Island R. R. Co. v. Tax Com'rs, 148 App. Div. 751, 133 N. Y. Supp. 348, affirmed on opinion below, 207 N. Y. 683, 101 N. E. 1117; People ex rel. R. R. Co. v. Tax Com'rs, 203 N. Y. 119, 96 N. E. 435; People ex rel. N. Y. C. R. R. Co. v. Woodbury, 203 N. Y. 167, 96 N. E. 431. In People ex rel. Retsof Mining Co. v. Triest, 75 App. Div. 131, 77 N. Y. Supp. 382, affirmed 175 N. Y. 511, 67 N. E. 1088), relator had no colorable right or permission to use the public streets from any governmental or political body having authority in proper cases to grant such right; and in People ex rel. Abraham v. Perley, 67 Misc. Rep. 471, 123 N. Y. Supp. 436, affirmed 143 App. Div. 915, 127 N. Y. Supp. 1137, and 202 N. Y. 620, 96 N. E. 1125, the privilege there conferred was conferred for private purposes, upon individuals, and not for any public use upon a public service corporation.

We think that the order made in this case was right, and that it should be affirmed, with $10 costs and disbursements. All concur.