THE HOLMES ELECTRIC PROTECTIVE Co., Plaintiff, v. WILLIAM ARMSTRONG, as Commissioner of Water Supply, Gas and Electricity, et al., Defendants.

(Supreme Court, New York Special Term, October, 1916.)

Corporations — organized to conduct business of burglary protection under chapter 265 of Laws of 1848 not a "telegraph company" — special franchise under section 73 of Greater New York Charter — complaint in action to enjoin city of New York from interfering with alleged franchise under act of incorporation and from exacting special franchise tax dismissed.

Public service corporations derive their right to use the streets of a city directly from the state and whatever right a municipality has to control such use it holds as the delegated agent of the state and not as an inherent municipal function.

Chapter 265 of the Laws of 1848, which was intended to permit the incorporation of telegraph companies, means corporations whose business it is to receive messages or communications between individuals and others and to transmit them from one place to another by the use in some form of the electric telegraph or telephone and there is nothing in said statute or in any of the acts amendatory thereof to enlarge in any way the foregoing definition of the kind of business contemplated to be done by the companies to be organized under said statute.

Where a corporation, though organized under said act of 1848, makes no claim to do a telegraph business or to be in any sense a public service corporation, but its business is that of protecting buildings and their contents against burglary, fire and other injuries, as stated in its certificate of incorporation, and so far as electricity or wires conducting an electric current are used they are in part the means by which protection is afforded and involve the use of the streets to a certain extent, the assumption of the corporate powers and franchises of a telegraph company, so far as the real business of the corporation is concerned, is wholly unauthorized.

The complaint of said corporation, praying that it may be decreed that at the time of its incorporation in 1883 under said statute of 1848 and ever since it has had a valid franchise to

construct, maintain and operate electrical conductors in the streets of the city of New York and that the city be enjoined from interfering with such right and from exacting any sum as the price of a special franchise, upon the claim that because of the act of 1848 it was duly invested by the state with a franchise to use the city streets and that there was no power in the state to subsequently burden such franchise with material conditions, much less to compel plaintiff to seek a new and additional franchise, and that section 73 of the Greater New York Charter relating to special franchises and which became effective January 1, 1898, is wholly inoperative as to plaintiff, will be dismissed.

Action to have it decreed that plaintiff, since 1883, has had a valid franchise to construct, maintain and operate electrical conductors in the streets of the city of New York.

Atwater & Cruikshank, for plaintiff.

Lamar Hardy, corporation counsel, for defendants.

Hotchkiss, J.   The plaintiff prays that it may be decreed that at the time of its incorporation in 1883 and ever since it has had a valid franchise to construct, maintain and operate electrical conductors in the streets of this city, and that the city be enjoined from interfering with such right and from exacting any sum as the price of a special franchise.   The facts are as follows:   The business was originated by Edwin Holmes prior to 1860.   It then consisted of the manufacture and sale of burglar alarms, electric call bells, annunciators and other signalling devices.   In 1872 the "central office system" of burglar alarms was instituted.   This system involved the connecting of the premises to be protected with a signal station by means of low tension electric wires, which in case of unauthorized or accidental interference automatically registered an alarm at the central office.   In the

course of time and for certain purposes the wires of the local telephone company were and still are utilized as part of plaintiff's " central system." Originally, and until plaintiff was forced to place its wires in the subway, such wires as belonged to plaintiff were run over housetops and elsewhere over and along private property, no material use being made of the streets, except as they were spanned by wires running from housetop to housetop. As an incident to the " central office system " watchmen were employed to patrol and inspect the protected premises and the apparatus connected therewith. Plaintiff also, as did its predecessors in business, maintains a corps of watchmen, whose services it lets to others for hire. In 1874 Holmes, under the provisions of the General Manufacturing Act of 1848, caused the Holmes' Burglar Alarm Telegraph Company to be incorporated, to which company he transferred the business theretofore conducted by him, which, as hereinbefore stated, consisted not alone of the manufacture and sale of electrical alarm devices, but as well of the " central office system " of electrical protection and the furnishing of watchmen. The business of the Holmes Company developed a competitor, so far as the department of electrical protection was concerned, in the American District Telegraph Company, a domestic corporation incorporated under the Telegraph Companies Act of 1848 (Laws of 1848, chap. 265). On January 25, 1883, the Holmes and the American District companies entered into an agreement the substance of which was that the Holmes' Electric Protection Company (the plaintiff) should be incorporated to take over the " central office electric burglar alarm protection " and the " private patrol and night watch signal " business of the several companies, with their patents, good-will and plant. This agreement was duly

consummated, since which time the business has been
conducted by plaintiff. The above agreement did not
provide for the sale or transfer by the American Dis-
trict Company of any franchise to conduct the busi-
ness theretofore conducted by it, nor was any such
transfer of franchise ever made, if in truth the Amer-
can District Company had any franchise to conduct
the business in question or one which it was capable of
transferring. In 1891 the first of plaintiff's wires
were, in pursuance of law and by direction of the
board of electrical control, placed in the subways of
the Empire City Subway Company, since which time,
as electrical subway construction has been extended,
plaintiff's wires have continued to be placed in the
subways, so that at the present time but few wires are
left overhead. From year to year the business of the
plaintiff has increased, to accommodate which increase
there has been a corresponding increase of plaintiff's
capital investment. At the present time its plant rep-
resents a value of approximately $1,000,000. Plaintiff
now has 2,392 subscribers for its electric protection
service in Manhattan and 60 in Brooklyn, and has in
use about 4,404 miles of wire in Manhattan and about
100 in Brooklyn. Since 1883 plaintiff has expended
in construction account nearly $1,600,000 exclusive of
the cost of underground conductors. Various of the
city departments have from time to time been among
those availing themselves of plaintiff's system of pro-
tection. So long as the law provided for such pay-
ments, to wit, from 1891 to 1897 inclusive, plaintiff was
called upon to pay and apparently did pay to the state
comptroller, as provided by law, its due proportion of
the expenses of the board of electrical control. Since
the year 1900 the plaintiff has been annually assessed
by the state authorities upon the value of its supposed
special franchise to use the city streets, which assess-

ments have been paid.  In or about the year 1910 the city officials discovered, or claimed to have discovered, that there were a number of corporations making use, in some measure, of the streets of the city for businesses in which electrical conductors were employed, and without having secured a special city franchise, as provided by the city charter.  Among the corporations so denounced was the plaintiff.  Beginning at about the time last mentioned, the city began to press plaintiff with demands that it should apply for a special franchise which demands plaintiff resisted.  From its incorporation plaintiff has been a frequent applicant to various of the city departments for permits with respect of street work necessary in the course of its operations, which permits seem to have been freely given.  This is true also of the period after 1910, during which the question of plaintiff's franchise rights was under discussion with the city officials and until the city finally insisted upon prompt compliance with its demands.  In the light of the evidence it may fairly be said that as the result either of an actual refusal on the part of the city of certain permits sought by plaintiff or as the result of a justifiable fear on plaintiff's part that if it did not comply with the city's demands further permits would be refused, an arrangement was entered into whereby plaintiff should and did apply for a special franchise, which was granted under date of October 14, 1914, and in pursuance of which plaintiff has agreed to pay to the city a considerable sum annually.  Incorporated into the instrument of grant are provisions to the effect that nothing contained therein nor any act in pursuance of its terms shall be deemed a waiver of plaintiff's right to urge that it was already in possession of plenary franchise rights, and was under no duty to secure a special franchise.  The same instrument also

makes provision for the conduct of the parties and for plaintiff's right to the return of moneys theretofore paid as consideration of the special franchise, in the event that litigation which plaintiff expresses its intention to begin should prove successful. The grounds on which plaintiff rests its prayer for relief are: (1) that its charter conferred upon it the right to use the city streets for overhead wires without the consent of the local authorities; (2) by virtue of the so-called subway acts it became plaintiff's right and duty to place its wires underground; (3) the city is estopped to deny plaintiff's aforesaid rights. There is a sharp difference between counsel for the respective parties as to what rights, if any, to use the city streets (subject to the ordinary municipal regulations) were secured by the plaintiff by virtue of its articles of incorporation *per se.* The arguments of the respective counsel on this point, however, are severally based on the assumption that by means of plaintiff's incorporation it secured such franchise rights as might lawfully be obtained by virtue of a sufficient incorporation. But in the view I take of the case it is unnecessary to determine as between the contentions of counsel on this point. It has long been the settled law of this state that what are commonly known as public service corporations derive their right to use the streets directly from the state. 3 Dillon Mun. Corp. (5th ed.) § 1228. Whatever right a municipality has to control such use it holds as the delegated agent of the state, and not as an inherent municipal function. *Village of Carthage* v. *Central New York Tel. & T. Co.,* 185 N. Y. 448; *People ex rel. City of New York* v. *New York Rys. Co.,* 27 id. 310. It is, therefore, a question of primary importance to determine whether or not the plaintiff has ever secured a franchise from the state to conduct its business and

to use the streets of the city in connection therewith, for it cannot be doubted that if the plaintiff is without any such franchise from the state it can never have been invested with the capacity to take or the city endowed with power to confer upon it a special franchise such as it claims to possess. *People ex rel. Metropolitan St. R. Co.* v. *State Board of Tax Comrs.*, 174 N. Y. 417; *Lord* v. *Equitable Life Assur. Soc.*, 194 id. 212, 225, 226.   Chapter 265 of the Laws of 1848, under which plaintiff was incorporated, is entitled "An act to provide for the incorporation and regulation of *telegraph* companies."   Section 1 says: "Any number of persons may associate for the purpose of constructing a line of wires of *telegraph* through this state or from and to any point within this state " upon the " terms and conditions " prescribed by the act.   The certificate of incorporation was, among other things, to specify " the general route of the line of telegraph, designating the points to be connected."   When properly incorporated under the act of 1848 and its amendments there is no question but that corporations so incorporated became invested with the right to take and to hold such so-called special franchises with respect of use of streets as the municipalities of the state had power to give. *American Rapid Tel. Co.* v. *Hess,* 125 N. Y. 641.   Plaintiff's certificate of incorporation was filed on January 29, 1883. In substance it states that the incorporators associate themselves together under the act of 1848 " for the purpose of doing a general telegraph and electric protection business * * * and for the purpose of owning and constructing, using and maintaining a line or lines of electric telegraph."   The general route of plaintiff's proposed lines is given as follows: " From a main office in the vicinity of the Stock Exchange in the city of New York, State of New York, to and with

points in said city where branch offices of the said association may be established, and from such offices along, across, over and under streets and avenues, and over buildings in said city, and to and into buildings therein, so as to connect such buildings with the offices of the association and to connect all such offices with each other. And also from said office to a main office in the City of Jersey City,'' and elsewhere, '' so as to connect buildings with said offices of the association in each of said cities or towns *for the purpose of protecting said buildings, together with their contents, against burglary and fire,* and for doing a general telegraphic business.'' The act of 1848, as explicitly stated in its title, was intended to permit the incorporation of '' telegraph '' companies. Although colloquial rather than technical in its description, the phrase cannot be misunderstood. It means corporations whose business it is to receive messages or communications between individuals and others, and to transmit them from one place to another, commonly by the use in some form of the electric telegraph or telephone. See 37 Cyc. 1606, 1607; *Hudson River Tel. Co.* v. *Watervliet T. & R. Co.,* 135 N. Y. 393, 404, 405. There is nothing in the text of the act of 1848, or in any of its amending acts, to enlarge in any way the foregoing definition of the kind of business contemplated to be done by the companies to be organized thereunder. The business conducted by plaintiff's predecessors, which plaintiff was incorporated to do, and in fact took over as a going affair, and has since continued, was in no sense that of a telegraph company. Except in a strained, remote and wholly fictitious sense, when regard is had for the facts and for the true significance of words, did plaintiff receive or transmit messages of any kind. Plaintiff's business was that of protecting buildings and their contents

Supreme Court, October, 1916.          [Vol. 97.

against burglary, fire and other injuries, exactly as plaintiff's certificate of incorporation states. So far as electricity or wires conducting an electric current were used, they were in part the means by which protection was afforded. The so-called '' system '' was one of automatic electric alarm signals. But this system was an incident, not an end, and plaintiff did not become a telegraph company because it employed electricity or wires or other form of conductors to convey its signals. Although the certificate of incorporation does state that in addition to the business of '' protecting '' '' buildings, together with their contents,'' the corporation is also '' for doing a general telegraphic business,'' it is manifest that, in the present circumstances at least, no force can be given to these words. This was not the business the corporation was formed to take over, and neither plaintiff nor its predecessors ever in fact conducted a '' telegraphic business.'' The insertion of this paragraph in the certificate tends to show, however, that the incorporators fully understood the distinction between the '' telegraphic business '' and the business their proposed company intended to pursue. That plaintiff does not even claim to do a telegraph business or to be in any sense a public service corporation is shown by what it said in its tax report to the state comptroller for the year 1910 (defendant's Exhibit E): '' This company does not operate any telegraph or telephone wire or lines; it does not perform any public service; it does not receive or transmit messages, persons or property, or anything else for hire; it is not a common carrier or public service corporation * * *. It does not offer its services publicly to any one * * *. Its business is the furnishing of protection to those special persons with whom it may make contracts, and in each case it makes a special contract with the per-

sons or corporation whom or whose property it undertakes to protect.'' See also report for 1912. In each of these reports plaintiff takes the position that it is a private corporation, and that its use of electric wires is merely incidental to its business; that '' its revenue does not arise from its operations of electrical conductors except incidentally, but primarily from the services rendered by it to persons in the protection of themselves and property '' and that its use of the subway cables and ducts is as tenant of the Empire City Subway Company under its franchise, and '' all the wires and cables and connections in or under any of the streets and subways or public places in the City of New York, *Borough of Manhattan,* both mains and branches, are in such subways so leased as aforesaid from the Empire City Subway Company and are laid, maintained and operated under the franchises of the subway company by this company as a tenant of the subway company and not otherwise. This company is, therefore, a customer and lessee and tenant of the Empire City Subway Company and its franchises.'' Unauthorized provisions of a certificate of incorporation filed in pursuance of a general law are to be treated as surplusage. *Albright* v. *Lafayette Bldg. & Savings Assn.,* 102 Penn. St. 411. I think it obvious, therefore, that plaintiff's assumption of the corporate powers and franchises of a telegraph company, so far as its business of electrical protection was concerned, was wholly unauthorized. R. S. pt. 1, chap. 18, tit. 3, § 3; *People ex rel. Third Ave. R. R.* v. *Newton,* 112 N. Y. 396; *Bath Gas Light Co.* v. *Claffy,* 151 id. 24, 29; *Oregon R. & Nav. Co.* v. *Oregonian R. Co.,* 130 U. S. 1; *People ex rel. Peabody* v. *Chicago Gas Trust Co.,* 130 Ill. 268. Nor is the inquiry into the validity of plaintiff's franchise barred by the rule of collateral attack. Plaintiff has come into a

13

court of equity alleging the existence of a valid franchise, and whatever rights it has must rest upon its ability to prove such a franchise. The question is therefore directly and not collaterally involved. *Zanesville* v. *Gas Light Co.*, 47 Ohio St. 1. If the foregoing views are sound they greatly limit the scope of if they do not actually determine the remaining questions. Stated with more particularity, the claim of the plaintiff is that because of the law of its incorporation it was duly invested by the state with a franchise to use the city streets, and that there was no power in the state to subsequently burden such franchise with material conditions, much less to compel it to seek from the city a new and additional franchise, for which reason the provision of section 73 of the Greater New York Charter, relating to special franchises, which became effective January 1, 1898 (Laws of 1897, chap. 378. See *Matter of New York Independent Telephone Co.*, 133 App. Div. 635, 644; affd., 200 N. Y. 527, and upon which the city relies), is wholly inoperative as to it. I do not understand the plaintiff to assert that the subway acts (Laws of 1884, chap. 534; Laws of 1885, chap. 499) operated to invest it with any rights with respect to the streets that it did not theretofore possess, so far at least as the general use of street wires is concerned. Its position is that it was subject to the provisions of those acts, and that having been compelled, in obedience to the terms thereof, to place its overhead wires underground, it is now too late for either the city or the state to challenge the lawfulness of its acts. To quote the language of plaintiff's counsel, "A command or direction to do a thing implies a permission to do it." The fallacy of this argument lies in the fact that it rests in the mistaken premise which underlies the plaintiff's whole case, namely, that it had the powers of a corporation authorized to use the

streets. It would be absurd to claim that the purpose
or effect of the subway acts was to validate charters
or to do anything more than to extend to corporations
then and thereafter lawfully authorized to use the
streets the privilege and duty to place their overhead
wires underground. The terms of the law itself show
that it applied only to " all duly authorized companies
operating or intending to operate electrical conduc-
tors in any street," etc. Laws of 1885, chap. 499, § 2.
So far as any estoppel as against either the state or
the city is concerned, whether by acquiescence or
otherwise, I shall not attempt to point out all of
the reasons why the doctrine may not be invoked by
the plaintiff; it will be sufficient to suggest some of
them. It is a self-evident proposition that whenever
a question arises directly involving the transfer to or
the investing in another of an estate, right or interest
two elements must necessarily exist, namely, capacity
to convey and capacity to take. If either of these ele-
ments is lacking manifestly the conditions are wanting
for the existence of any legal estate in the grantee.
And it is immaterial whether the means by which the
estate is sought to be established rest in express
grant, estoppel or otherwise. It follows that before
the plaintiff can be heard to assert that the city or the
state is estopped to deny plaintiff's alleged franchise
right plaintiff must show that it has lawful capacity
to take and to hold the franchise in question, and this,
as I have shown, plaintiff does not possess. Nor
would it be within the power of state or city officials
to confer any such state franchise as plaintiff claims,
because such right could in any event be conferred by
nobody short of the Legislature, and then under such
constitutional limitations as are applicable. 3 Dillon
Mun. Corp. (5th ed.) § 1210; *Beekman* v. *Third Ave.
R. R. Co.,* 153 N. Y. 144, 152; Const. art. 8, § 1. See,

also, *Driggs* v. *Phillips,* 103 N. Y. 77. I have examined the numerous cases cited by the plaintiff and many others but, assuming that the doctrine of estoppel might under proper circumstances be invoked against the state as well as the city, the present case presents no facts justifying the application of the doctrine. Generally speaking the cases in which the question of estoppel has arisen are those in which either (1) concededly there was on one side a party having power to grant the right concerning which the estoppel was claimed and on the other a party competent to take such right, and (2) the right or interest had been granted or attempted so to be and the question involved concerned the power of the party against whom the estoppel was asserted to question the efficacy of the grant. Plaintiff's present difficulties arise wholly because of its own unlawful assumption. Nothing has ever been expressly or by necessary implication granted to it and of which it is sought to be deprived. Such chartered powers as it has arose from a general law authorizing the formation of corporations which, under proper circumstances, were empowered to make use of the streets for their corporate purposes. The business actually conducted by plaintiff did involve the use of the streets to a certain extent and so was ostensibly of a character compatible with lawful street use. Although not always consistent in its characterization of its own corporate nature and powers, plaintiff, from the law under which it was incorporated and as well from the apparent general nature of its business and the use it has actually assumed to make of the streets, has held itself out to be lawfully in possession of such franchise rights as it was necessary for it to possess. It was not the duty of the authorities, state or city, to assume that plaintiff's business was without warrant of law

and that its use of the streets was that of a trespasser. The authorities had no actual notice of the actual facts, nor were they under any duty to inquire. Without investigating the lawfulness of its powers or pretended rights, the authorities, state and city, have for a series of years accepted plaintiff at its own superior valuation and have imposed upon it such taxes and other general obligations as all corporations of the character such as plaintiff claimed or appeared to be were properly subjected to. Neither the state nor the city officials have done anything they were not impliedly invited to do by the conduct of the plaintiff itself. Plaintiff is and has at all times been chargeable with notice of its legal incapacity and deficiencies, and it can take nothing because of the failure of the state or the city to make earlier discovery of them. The findings submitted should be made to conform to the foregoing, and the plaintiff's complaint dismissed, with costs.

Ordered accordingly.