HOLMES ELECTRIC PROTECTIVE COMPANY, Appellant, *v.* WILLIAM WILLIAMS, as Commissioner of Water Supply, Gas and Electricity, and Others, Respondents.

First Department, January 18, 1918.

Corporations — validity of incorporation as telegraph company cannot be collaterally attacked — validity of incorporation must be determined in suit to which People of State is party — municipal corporations — secondary franchise to use public streets for electric wires must be obtained from municipal authorities — when no estoppel by permission of such use without secondary franchise.

A corporation which received its certificate from the State in 1883 and was organized under the provisions of the acts of 1848 and 1853 as a telegraph company, thereby became incorporated as a telegraph company, and the

question as to whether its incorporation was invalid in that, instead of conducting a telegraph business strictly speaking, it engaged in the business of furnishing protection against burglary by a system of electric alarm, etc., cannot be raised collaterally by the city of New York in an action brought by such corporation to enjoin the city from interfering with the plaintiff in the operation of its alleged franchise rights in said municipality. The validity of the incorporation can only be raised by the People of the State of New York, without whose presence before the court no adjudication on such issue can be made.

*It seems*, that an action to test the validity of such incorporation must be brought by the People of the State by whom the franchise was granted if, in the judgment of the proper State officials, any cause for such action exists.

Assuming, however, that the plaintiff was lawfully incorporated as a telegraph company under the acts aforesaid it did not thereby acquire any special franchise to operate its wires over or under the streets of the city of New York without the permission of the proper municipal authorities and, in addition to the franchise acquired from the State, it was also required to obtain from the city the special, or so-called secondary, franchise to use the city's streets for the maintenance of its wires and fixtures.

Moreover, the fact that the plaintiff for many years had been allowed to maintain its wires over private buildings and was subsequently required by the city of New York to place its wires in subways thereafter constructed, did not operate to estop the city from asserting that the plaintiff has no right to use the city streets except as authorized by a municipal or secondary franchise to do so, obtained from the proper municipal authorities.

It follows from the considerations aforesaid that the plaintiff's suit to enjoin the city from interfering with the operation of its lines was properly dismissed.

. APPEAL by the plaintiff, Holmes Electric Protective Company, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on or about the 22d day of December, 1916, dismissing the complaint upon the decision of the court after a trial at the New York Special Term.

*Alfred B. Cruikshank* of counsel [*Charles T. Russell* with him on the brief], *Atwater & Cruikshank*, attorneys, for the appellant.

*Frank Julian Price* of counsel [*Samuel J. Rosensohn* with him on the brief], *Lamar Hardy, Corporation Counsel,* attorney, for the respondents The City of New York and others.

*George L. Ingraham* of counsel for The American District Telegraph Company, intervening.

DOWLING, J.:

This is an appeal from a judgment dismissing the complaint in an action brought to secure, among other things, an injunction restraining the defendants from interfering with the plaintiff in the operation of its alleged franchise rights, and also restraining the city of New York and its official representatives from demanding or collecting any sums of money from plaintiff as a condition of granting a further or additional franchise, or for the operation of its present alleged franchises, or for permission to extend its present lines. It was also sought to enjoin the Empire City Subway Company, Ltd., from refusing plaintiff space in and access to its subways for the operation of its business, and to enjoin the defendant Williams and his successors from interfering with the plaintiff's business, and to obtain a mandatory injunction requiring him to issue to plaintiff such permits as might be necessary in the conduct of its business and the use of the city streets. Judgment was also prayed that plaintiff at the time of its incorporation in 1883 had, and ever since has had, and now has, a good and valid franchise and vested right to erect, construct and operate electric telegraph lines, wires and conductors in, over and upon and under the streets and highways of the city of New York. There is practically no dispute as to the facts in the case.

In 1872 Edwin Holmes instituted the central office system of burglar alarms, which involved the connecting of the premises to be protected with a central station by means of low tension electric wires which, in case of unauthorized or accidental interference, automatically registered an alarm at the central office. Incidentally thereto watchmen were employed to patrol and inspect the protected premises and the apparatus connected therewith. In 1874 Holmes caused to be incorporated the Holmes Burglar Alarm Telegraph Company under the provisions of the General Manufacturing Act of 1848 (Laws of 1848, chap. 40), to which he transferred his then existing business, which did not include any receipt of messages or communications between individuals nor their transmission from place to place.

The American District Telegraph Company had been incorporated under the Telegraph Companies Act of 1848 (Laws of 1848, chap. 265), and its business did not include receiving messages or communications from individuals and their transmission by the electrical telegraph from one place to another.  On January 29, 1883, the plaintiff was organized under the laws of the State of New York pursuant to the provisions of chapter 265 of the Laws of 1848, entitled " An Act to provide for the incorporation and regulation of telegraph companies."  The purposes for which it was organized, as set forth in the articles of incorporation, were the doing of a general telegraph and electric protection business, and to own, construct, use and maintain a line or lines of electric telegraph partly within and partly without the limits of the State of New York, and for the purpose of owning interests in such line or lines of electric telegraph and any grants thereof.  The general route of the telegraph and protective line, as set forth in said articles, was from the main office near the Stock Exchange to points in the city of New York where branch offices might be established, and from such offices along, across and under streets and avenues and over buildings in said city and into buildings so as to connect such buildings with the offices of the association, and to connect all such offices with each other; also to connect the main office with another main office in Jersey City and with other cities and towns in the States of New York and New Jersey or other points in the United States, so as to connect buildings with the offices of the association in each of said cities or towns, for the purpose of protecting said buildings together with their contents against burglary and fire, and for doing a general telegraphic business.

Chapter 265 of the Laws of 1848 provided certain requirements for the articles of association of those who sought to be incorporated thereunder, including the general route of the line of telegraph, designating the points to be connected, and provided (§ 5) that corporations organized thereunder were authorized to construct lines of telegraph along and upon any of the public roads and highways, or across any of the waters within the limits of the State, by the erection of the necessary fixtures, including posts, piers or

abutments, provided the same should not incommode the public use of the roads or highways or injuriously interrupt the navigation of said waters. Chapter 471 of the Laws of 1853 amended the act of 1848, but provided (§ 2) that a corporation organized thereunder was authorized to erect and construct from time to time the necessary fixtures for its lines of telegraph over, upon or under any of the public roads, streets and highways, and through, across or under any of the waters within the limits of this State, subject to the restrictions in the act of 1848 contained; and also to erect and construct such fixtures upon, through or over any other land, subject to the right of the owner thereof to full compensation for the same.

Upon its incorporation, plaintiff, pursuant to an agreement made some four days before between the Holmes Burglar Alarm Telegraph Company and the American District Telegraph Company, took over the central office system of electrical burglar alarm protection and the private patrol and night watch signal business of both companies, with their patents, good will and plant, and thereafter conducted both businesses in its own name and as one enterprise. Before the passage of the first Subway Act (Laws of 1884, chap. 534), the plaintiff owned and operated numerous overhead electrical lines and wires in the city of New York extending from its central offices and crossing the streets and highways to premises protected by its service, and in January, 1883, it was furnishing protective service to 927 subscribers, and in January, 1884, to 997 subscribers. This business has since grown so that at the present time plaintiff is operating nearly 4,500 miles of wire in the entire city of New York, whereof 4,404 miles are in the borough of Manhattan serving 2,520 subscribers. It has expended for construction since 1883 more than $1,500,000, and the value of the property employed in its business at the time of the trial was over $1,000,000. Under the agreement made between the Holmes Burglar Alarm Telegraph Company and the American District Telegraph Company there was no provision made for the sale of any franchise belonging by the latter to the former.

Plaintiff's business since incorporation has been furnishing protection from burglary to banks, commercial establish-

ments and residence and other buildings, which service is performed principally by means of electric signals, devices and appliances operated by electrical wires and conductors extending from various stations and central offices, which originally were overhead and so continued until 1891, in which year, pursuant to the provisions of chapter 499 of the Laws of 1885, establishing a board of commissioners of electrical subways in cities of 1,000,000 population and over, to enforce the requirements of the act of 1884 as to placing wires under-ground, plaintiff began gradually to place its wires in the subways and so continued until, at the time of the trial of this action, the greater part of its wires were in the subways both in the boroughs of Manhattan and Brooklyn. The placing of plaintiff's wires in the subways was done under the direction of the board of electrical control, which was the successor of the board of commissioners of electrical subways (Laws of 1887, chap. 716), and all the location of its wires under-ground has been done by plaintiff pursuant to the direction of said board and its successors in the control of electrical telegraph lines and conductors in the city of New York.

Down to the year 1910 plaintiff's franchise was never questioned either by the State or by the city of New York, and it continued to carry on its business without interference from either, and its existence was recognized not only by the compulsion exercised upon it to put its wires in the said sub-ways and pay for the space therein, but also by special franchise taxes levied upon it amounting in sixteen years to over $57,000 by the State Comptroller collecting from it its share of the expenses of the maintenance of the subway commissioners, and by the city of New York making contracts with it for its burglar alarm service. As the result of doubts raised as to the validity of plaintiff's franchise, in 1910 plaintiff was required to file a verified petition with the board of estimate and apportionment for a franchise before a day fixed, with which plaintiff, without waiving its legal rights, complied but stated it did so provided the permission were granted upon terms that would not prejudice, impair or limit any of the rights heretofore acquired and now owned or possessed by the company to use the streets of the city of New York. No action having been taken upon this petition, the present suit

was commenced to prevent any interference by the city or its officials with plaintiff's continuance of its business and its use of the streets and the subways, and thereafter an agreement was made by which certain payments were made by the plaintiff to the city of New York in consideration of what is commonly known as a secondary franchise; but without prejudice to plaintiff's rights or claims. It appears that for the rights thus given the plaintiff was required to pay the sum of $25,000 in cash, with an additional annual sum of $15,000 for the first five years of the franchise, $20,000 for the second five years, and $25,000 for the remaining term of the franchise, which was to expire in 1928, with a privilege of renewal for a further period of ten years.

Plaintiff claims that when it obtained its certificate of incorporation from the State in 1883 and was organized, under the provisions of the acts of 1848 and 1853, as a telegraph company, the State conferred upon it, in common with all other corporations organized under said act, the right to use the streets of New York for its overhead wires, without the need of local or municipal consent; that as the subway acts operated to convert plaintiff's overhead franchise into an underground franchise and to ratify and confirm its rights in the streets, those rights were also not subject to question or attack by the city but were effectual without the city's consent. Plaintiff also claims that if it should be held that its franchise in the streets was not conferred upon it by reason of its incorporation, such franchise had become vested in plaintiff by the use, occupation and expenditure of time and money in good faith on the strength thereof long prior to the present controversy, and the validity thereof is established by acquiescence; and that the city of New York is estopped to deny the same and forbidden by law to destroy or impair it.

The learned trial court has found against plaintiff upon both these propositions. As to the first, it has held that plaintiff's assumption of the corporate powers and franchise of a telegraph company, so far as its business was concerned, was wholly unauthorized. In so determining it held that the word " telegraph " as used in the acts of 1848 and 1853 applied only to corporations whose business it was to receive messages or communications between individuals and others and to

transmit them from one place to another commonly by the use in some form of the electrical telegraph or telephone. The court held that the business conducted by plaintiff was in no sense that of a telegraph company but simply that of protecting buildings and their contents against burglary, fire and other injuries, and that, although electricity or wires conducting an electrical current were used in such business, they were merely incidental thereto, and that their use did not constitute a telegraph use nor bring the plaintiff within the scope of the acts in question. The court also held that, although the certificate of incorporation stated that the company was organized as well to do a general telegraph business, no force could be given to those words, they should be treated as surplusage, and that neither plaintiff nor its predecessors in fact ever conducted such a business. (See *Holmes Electric Protective Co.* v. *Armstrong,* 97 Misc. Rep. 184.)

While this question is an interesting one, I do not think it is properly raised in this case, nor that it can be determined as between the parties now before this court. The certificate of incorporation of the plaintiff upon its face complied with the requirements of the acts under which incorporation was sought. The State of New York created plaintiff a corporation pursuant to the terms of those acts, and it thereby became incorporated as a telegraph company. If the plaintiff has exceeded its lawful corporate powers, if it has forfeited its right to exercise its corporate powers or any part thereof by reason of nonuser, or if the validity of the incorporation itself is subject to any attack, those questions must be raised by the State of New York under whose authority the corporation was formed, and plaintiff's corporate existence or powers cannot be collaterally attacked. It is quite true that the complaint asks for relief by way of an adjudication that plaintiff at the time of its incorporation in 1883 had, and ever since has had, and now has, a good and valid franchise and vested right to erect, construct and operate electric telegraph lines, wires and conductors in, over, upon and under the streets and highways of the city of New York. But this is only the legal conclusion which is deduced from plaintiff's incorporation by the State, and the plaintiff has not voluntarily tendered any issue as to the validity of incorporation, but

stands upon the fact of its incorporation in 1883, under the laws in question. No issue as to the fact of such incorporation is tendered by the answers interposed herein. If then the defendants desired to test the validity of plaintiff's incorporation or its right to do business thereunder, or its power to exercise any of the privileges thereby conferred, or the exercise by it of powers in excess of its corporate rights, it was necessary to have these issues raised by the People of the State of New York, without whose presence before the court, as it seems to me, no adjudication upon these points would be effectual. In fact the appropriate remedy would seem to be one brought by the People of the State of New York by whom the franchise was granted, if in the judgment of the proper State officials any cause for such an action existed. (See *City of New York* v. *Bryan,* 196 N. Y. 158; *New York Central & Hudson River R. R. Co.* v. *City of New York,* 202 id. 212; *Matter of Brooklyn Elevated R. R. Co.,* 125 id. 434; *People ex rel. East River Terminal Railroad* v. *Board of Tax Comrs.,* 160 App. Div. 771; *People ex rel. Karl* v. *United Traction Co.,* 145 id. 645.) This conclusion, therefore, leads to our disagreeing with the determination of the learned trial court that plaintiff acquired no rights whatever to a franchise as a telegraph corporation by reason of its incorporation, inasmuch as such question was not properly before the court for determination. In so doing, however, we do not intend to indicate any opinion as to whether or not the language of the telegraph acts was sufficiently broad to cover the field of plaintiff's activities.

Assuming that the plaintiff was lawfully incorporated as a telegraph company under the statutes in question, did it acquire thereby any special franchise to operate wires over or under the streets of the city of New York without the permission of the appropriate municipal authorities? In other words, beside the corporate franchise which plaintiff received from the State of New York, was it also required before it could use the city streets to obtain from the city authorities a special (or so-called secondary) franchise? Plaintiff stands upon the proposition that its certificate of incorporation gave it, under the language of chapter 265 of the Laws of 1848 (§ 5) and chapter 471 of the Laws of 1853 (§ 2),

hereinbefore referred to, a franchise to erect and construct from time to time the necessary fixtures for lines of telegraph upon, over or under any of the public roads, streets and highways, and through, across or under any of the waters within the limits of the State; provided that the same should not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters.   Among the cases cited in support of the proposition that the franchise granted by the State is all that is required and that no secondary franchise is requisite, are *Village of Carthage* v. *Central New York Telephone Co.* (185 N. Y. 448); *Barhite* v. *Home Telephone Co.* (50 App. Div. 25), and *New Union Telephone Co.* v. *Marsh* (96 id. 122).   But in *Matter of New York Independent Telephone Co.* (133 App. Div. 635) it was remarked that in none of those cases had the attention of the court been directed to chapter 483 of the Laws of 1881 (amdg. Laws of 1879, chap. 397, § 1).   I think that the decision in that case is controlling here.   The facts therein were as follows: The original corporation was the Mercantile Safe Deposit Company organized under chapter 613 of the Laws of 1875, which as far back as 1890 had made application for leave to put its wires in the subway in New York city which had been denied, its purpose being to continue telegraphic connection with a police station. Thereafter, on April 5, 1894, the persons interested in the Mercantile Company organized the Mercantile Electric Company for the purpose of " constructing, owning, using and maintaining a line or lines of electric telegraph or telephone in the city of New York, and for the purpose of operating and conducting electric currents in and through the streets of the city of New York," and this company in 1894 asked the board of electrical control for permission to have its necessary wires placed in the subway, which was granted, and space was assigned for its wires by the Empire City Subway Company in the latter's subways.   In 1905 the Mercantile Electric Company filed with the Secretary of State a certificate of the extension of its lines by which it purported to cover any and all of the public streets, avenues, highways and other public places and waters in the city of New York from a point or points in said city to and connecting all other points in said

city and in each and every borough thereof; the whole State of
New York, and from the most southerly point of Mexico to
the most northerly point of Canada, and from the most
westerly point of the United States and Canada to the most
easterly point of the United States and Canada, and also
by cable and other appropriate means with the rest of the
known world.   On February 20, 1905, the New York Inde-
pendent Telephone Company was incorporated for the purpose
of constructing, buying, leasing or owning lines of electric
telegraph and telephone wholly within the State, and also
lines partly within and partly beyond the State, and on
October 7, 1905, it merged with the Mercantile Electric Com-
pany, which conveyed to it the latter's property rights,
privileges and franchises of every kind, including the franchise,
right or consent to lay and construct suitable wires in subways,
granted by the board of electrical control.   In July, 1907,
the telephone company requested permission from the com-
missioner of the department of water supply, gas and electricity
to string a cable in a duct previously assigned to the Mercantile
Electric Company and such application having been refused,
the company applied for a peremptory writ of mandamus to
compel the commissioner to grant the application, which hav-
ing been denied, an appeal was taken to this court.   In affirm-
ing the order denying the writ of mandamus, Mr. Justice
CLARKE quoted in full the provisions of chapter 483 of the
Laws of 1881, amending section 1 of chapter 397 of the Laws of
1879, as follows: " Any company or companies organized and
incorporated under the laws of this State for the purpose of
owning, constructing, using and maintaining a line or lines of
electric telegraph within this State or partly within and
partly beyond the limits of this State, are hereby authorized,
from time to time, to construct and lay lines of electrical con-
ductors under ground in any city, village or town within the
limits of this State, subject to all the provisions of law in
reference to such companies not inconsistent with this act;
provided that such company shall, before laying any such
line in any city, village or town of this State, first obtain
from the common council of cities, the trustees of villages, or
the commissioners of highways of towns, permission to use the
streets within such city, village or town for the purposes herein

set forth." Mr. Justice CLARKE said (p. 645): " This act continued unrepealed until by chapter 219 of the Laws of 1909, being chapter 63 of the Consolidated Laws, the Transportation Corporations Law, it was annexed bodily to section 102. This is legislative recognition, as it seems to me, that telephone and telegraph companies have, during all this period, been governed by the same provisions requiring the consent of the local authorities as have the other companies which occupy the streets under the surface. It follows that when the original certificate was filed there were existing provisions of law which required the consent of the local authorities, to wit, the board of aldermen, which consent was never applied for or granted.'

Upon appeal to the Court of Appeals the order was affirmed, upon the opinion of Mr. Justice CLARKE in this court (200 N. Y. 527). That the legislative department of the municipal government was originally the sole source of the grant of a secondary franchise (as distinguished from any administrative department) had been decided in *Ghee* v. *Northern Union Gas Co.* (158 N. Y. 510) and *People ex rel. West Side Electric Co.* v. *Consolidated Telegraph & Electrical Subway Co.* (187 id. 58). That the mere fact of incorporation under the telegraph acts did not confer a franchise to use the city streets without the consent of the appropriate local authorities necessarily follows as well from the decision of the Court of Appeals in *Matter of New York Electric Lines Co.* (201 N. Y. 321) and the reasoning followed in the opinion of Judge HAIGHT therein (affd., *sub nom. New York Electric Lines* v. *Empire City Subway*, 235 U. S. 179). The decision in *Matter of Long Acre Electric Light & Power Co.* (188 N. Y. 361) is in no way inconsistent with these holdings, for there the municipal authorities, as the opinion shows, had as far back as 1887 granted a secondary franchise to one of the company's predecessors in title. It follows that when the plaintiff was incorporated, its franchise from the State gave it no right (in view of the provisions of chapter 483 of the Laws of 1881) to construct and lay underground any lines of electric conductors in New York city without the consent of the appropriate local authorities (constituting the so-called secondary franchise) and that consent it never received until the action of the board of estimate and apportionment in September, 1914,

resulting in the contract between the city of New York and the plaintiff, made October 14, 1914. No action, or failure to act, upon the part of the city authorities constituted an estoppel so as to dispense with the necessity for such consent, or furnished a substitute therefor. This conclusion requires a negation of all the contentions raised by the plaintiff as to its rights to place its wires underground or in the subways without the consent of the local authorities. Undoubtedly this is the only vital question to plaintiff, as the successful operation of its business would be impossible without the right to have its conductors installed in the underground conduits. But I am of opinion that its claim to have a franchise to use the streets of the city of New York for the construction and maintenance of its overhead wires is also untenable. Certainly since the passage of chapter 534 of the Laws of 1884 and chapter 499 of the Laws of 1885 it can claim no such rights which survive a demand by the local authorities that such wires be removed. (*American Rapid Telegraph Co. v. Hess*, 125 N. Y. 641.) As to its Brooklyn lines, plaintiff has been using underground wires which it leases from the New York Telephone Company since the installation of the subway system in that borough  Before it began to place its wires in the Manhattan subways, plaintiff's wires were run over housetops and elsewhere over and along private property, no material use being made of the city streets, except as they were spanned by wires running from housetop to housetop. As to all its city wires, it appears that when it placed underground such as were in existence and operation over the housetops on June 14, 1884, they were not placed in subways whose location corresponded with the former lines or routes overhead, but they were laid under and along the streets of the city on new or different routes.

There is no proof that any of plaintiff's overhead wires, placed in position before June 14, 1884 (when the first act requiring the placing of wires underground took effect), are still maintained in the same position, or follow the same routes. The same is true as to the period ending January 1, 1898, when the Greater New York charter (Laws of 1897, chap. 378) took effect. After the latter date, no perpetual franchise to use the city streets could be granted (§ 73, as amd. by

Laws of 1899, chap. 564; Laws of 1901, chap. 466, and Laws of 1905, chap. 629).

The judgment appealed from is affirmed, but solely upon the ground of plaintiff's failure to procure at any time before the commencement the consent of the municipal authorities, constituting the special (or secondary) franchise, and not because plaintiff was improperly incorporated under the telegraph act. The appropriate changes in the findings of fact and conclusions of law to conform to this opinion will be made, the order to be settled on notice, and the judgment appealed from will thereupon be affirmed, with costs to respondents.

CLARKE, P. J., LAUGHLIN, SMITH and PAGE, JJ., concurred.

Judgment affirmed, with costs. Order to be settled on notice.